UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

| | | |
|---|---|---|
| JOHN DOE, | : | 14 Civ. 3573 (JMF) |
| | : | |
| Plaintiff, | : | **AMENDED** |
| | : | **COMPLAINT** |
| -against- | : | |
| | : | |
| COLUMBIA UNIVERSITY and | : | **JURY TRIAL** |
| TRUSTEES OF COLUMBIA UNIVERSITY, | : | **DEMANDED** |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------X

Plaintiff John Doe [1] (hereinafter referred to as "Plaintiff"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.     Plaintiff seeks redress against Defendant Columbia University and the Trustees of Columbia University (collectively, "Defendant Columbia" or "Columbia University") due to the actions, omissions, errors, and the flawed procedures, and/or negligence and overall failure to provide Plaintiff with an expected standard of due process, concerning the wrongful allegations of sexual misconduct made against John Doe, a male, sophomore student at Defendant Columbia in good standing, and a member of Columbia University's crew team

---

[1] Plaintiff's Motion to proceed pseudonymously as "John Doe" was granted on June 9, 2014.

with an otherwise unblemished record.  The unfounded allegations were made by fellow Columbia student, Jane Doe, a freshman student at the time.

2.    John Doe and Jane Doe were friends within the same social circle at Columbia University.  It was at Jane Doe's suggestion that they engaged in one night of consensual sexual activity during finals week in the Spring of 2013 ("Evening of May 12") inside Jane Doe's suite bathroom. It was Jane Doe who let Plaintiff John Doe in the bathroom in order to obtain a condom from her dormitory room, then returning to the suite bathroom to undress herself in front of John Doe. After the evening ended, Jane Doe and John Doe left each other's company on good terms.

3.    Several weeks into the Fall 2013 semester and nearly five (5) months after the one night of sexual activity, Jane Doe decided to report the Evening of May 12 as "non-consensual" sexual activity.  No contemporaneous report was ever made nor was any police report ever filed by Jane Doe in connection with her sexual activity with Plaintiff John Doe; no visit to a medical care facility was ever made by Jane Doe in connection with such sexual activity either; and indeed, no allegation of improper sexual behavior was made by Jane Doe for nearly five (5) months after the one night of sexual activity with John Doe.  Notwithstanding the foregoing, and further notwithstanding a paucity of direct evidence, including an

2

unforgiveable lack of administrative continuity and simple, practical good sense during the investigatory process, Defendant Columbia found John Doe guilty of sexual misconduct in having non-consensual sex with Jane Doe and has issued Plaintiff John Doe an order of suspension from Columbia University until Fall 2015.

4.      In Defendant Columbia's finding that Plaintiff John Doe was guilty of sexual misconduct; Plaintiff John Doe was deprived of the most basic due process and equal protection rights and was discriminated against on the basis of his male sex.  In essence, there was a rush to judgment, pandering to the political climate on campus and pressure from women's (special interests) groups, with little thought, if any, given to the actual specifics of Plaintiff John Doe and Jane Doe's actual situation. John Doe was denied the effective assistance of any advisor; cross-examination of his accuser was effectively denied; John Doe was denied being able to call key witnesses and when such deficiency was raised, John Doe was met with overall dismissal as to their importance; and the hearing tribunal immediately announced its decision upon conclusion of an abbreviated session, reflecting the lack of impartiality and pre-judgment against an accused male student.  Columbia University's fact finding process relied upon a biased investigator whose false, anti-

male biased narrative was adopted by the hearing panel and relied upon by a Dean to deny the appeal.

5.     Defendant Columbia failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to enable a student to have a fair hearing before an impartial tribunal.  The decision reached was discriminatory and/or arbitrary and capricious; given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached and suspension ordered.

6.     In fact, it is common knowledge that, at the time of John Doe's disciplinary hearing and sanction, Columbia University was undergoing negative public scrutiny and backlash by student political organizations for Columbia University's lack of vigilance against male students (especially male student athletes) accused of sexual assault, and the perceived failure of Columbia University to mete out appropriately high sanctions.

7.     Columbia University either succumbed to pressure from various special interest groups or otherwise sought to make an "example" out of John Doe as a "student athlete" accused of sexual assault and meted out a disproportionately severe sanction of a two-year suspension from the school, notwithstanding the lack

of any evidence that the sexual activity between John Doe and Jane Doe was non-consensual.

8.      Particularly of note is the fact that even Jane Doe believed the sanction to be too severe and personally appealed the decision, as did Plaintiff John Doe. Plaintiff John Doe's appeal enumerated significant errors and/or omissions that occurred throughout the entire process, including crucial errors in the investigatory stage.   Notwithstanding the appeals, Columbia University refused to change its ruling.

9.      John Doe has been greatly damaged by the suspension: John Doe's educational career has been put on hold; his academic future has been severely damaged; the monies spent on obtaining a college education at Defendant Columbia squandered;  and his psychological and emotional health has been greatly compromised by the entire ordeal.   Thus, John Doe brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972 and state law.

## THE PARTIES

10.      Plaintiff John Doe ("Plaintiff") is a natural person residing in the State of Florida with an address of 11580 Mandarin Cove Lane, Jacksonville, Florida 32223.  During the events described herein, John Doe was a student at Columbia

University and resided on the Columbia University campus in New York, New York.

11.     Upon information and belief, Defendant Columbia University ("Defendant Columbia" or "Columbia University") is a private Ivy League University located in the Upper Manhattan area of New York City.   Upon information and belief, Columbia University operates under a 1787 charter that places the institution under a Board of Trustees, namely, the Trustees of Columbia University in the City of New York.

12.     John Doe and Defendant Columbia are sometimes hereinafter collectively referred to as the "Parties".

## JURISDICTION AND VENUE

13.     This Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1332 because: (i) John Doe and Defendant Columbia are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

14.     This Court has personal jurisdiction over Defendant Columbia on the grounds that Defendant Columbia is conducting business within the State of New York.

15.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.  Agreements, Representations, Covenants & Warranties Between John Doe and Defendant Columbia

16.     John Doe is a Florida native and son of a renowned cardiologist, with two older siblings in medical school; John Doe comes from a household where education is held in high esteem. John Doe worked diligently in high school, succeeded in advanced placement courses, earned seven (7) AP credits toward college and graduated with a 3.95 GPA. While in high school, John Doe was a four-year varsity athlete and earned state and national level championships. John Doe scored in the 95th percentile in the SAT standardized college entrance examination.

17.     Setting his sights on an Ivy League education, John Doe applied early decision to Columbia University and was accepted to the class of 2016.

7

18.     Upon his acceptance, Defendant Columbia provided John Doe with copies of its school policies, including the Gender-Based Misconduct Policies for Students.   Such documents are also readily available on Defendant Columbia's Internet website.

19.     Columbia   University's   Student   Policies   and   Procedures   on Discrimination and Harassment state, among other things:

> Columbia University is committed to providing a learning, living, and working environment free from discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members. **The University does not tolerate discrimination or harassment on the basis of membership in a Protected Class,** and it provides students who believe that they have been the subject of discrimination or harassment with mechanisms for seeking redress. Nothing in this policy shall abridge academic freedom or the University's educational mission. **All members of the University community are expected to adhere to the applicable policies, to cooperate with the procedures for responding to complaints of discrimination and harassment, and to report conduct or behavior they believe to be in violation of these policies to EOAA.** Management and supervisory personnel have a duty to act; they are responsible for taking reasonable and necessary action to **prevent discrimination and harassment and for responding promptly and thoroughly to any such claims.** University officers who learn of an allegation of gender-based misconduct, discrimination, or harassment have a duty to report the allegation to EOAA or Student Services for Gender-Based and Sexual Misconduct. All students are protected from retaliation for filing a complaint or assisting in an investigation under these policies. **Appropriate disciplinary action may be taken against any student or employee who violates these policies.**

8

(emphasis added).

20.     According to Columbia University's Gender-Based Misconduct Policies for Students:

> Columbia University, Barnard College, and Teachers College are committed to providing a learning environment **free from gender-based discrimination and harassment**. As such, the University does not tolerate any kind of gender-based discrimination or harassment, which includes sexual assault, sexual harassment, and gender-based harassment. The University community is committed to fostering a healthy and safe environment in which every member of the community can realize her or his fullest potential.
>
> Gender-based misconduct is a serious concern on college campuses throughout the country. To address this problem, the University provides educational and preventive programs, services for individuals who have been impacted by gender-based and sexual misconduct, and accessible, prompt, and equitable methods of investigation and resolution.
>
> Students who believe they have been subjected to gender-based discrimination or harassment are encouraged to report these incidents. **Upon receiving a report, the University will respond promptly, equitably, and thoroughly.** In addition, the University will take steps to prevent the recurrence of the discrimination or harassment and correct its effects, if appropriate.

(emphasis added).

21.     Furthermore, Columbia University expressly covenants to provide the following rights to "Respondents" (i.e. the accused student) in gender-based misconduct proceedings:

9

- To be treated with respect, dignity, and sensitivity throughout the process.

- To seek support services at the University.

- To confidentiality and privacy to the extent provided under applicable law. The University will make all reasonable efforts to ensure preservation of privacy, restricting information to those with a legitimate need to know.

- To be informed of the University's Gender-Based Misconduct Policies and Procedures for Students.

- To a prompt and thorough investigation of the allegations.

- To an adequate amount of time to prepare for the hearing. Participants shall be given at least five (5) calendar days' notice prior to the hearing except in rare circumstances.

- To review all applicable documents prior to the hearing in the Student Services for Gender-Based and Sexual Misconduct office.

- To challenge investigator(s) or any hearing panel member if a possible conflict of interest is present.

- The right to replace the student panelist with a dean or senior-level administrator if both parties agree.

- To be accompanied at the hearing by a supporter.

- To participate or decline to participate in the investigation or hearing panel process. However, the disciplinary process will continue with the information available, and not participating in the investigation may preclude participation in the hearing panel.

10

- To refrain from making self-incriminating statements. However, the disciplinary process will continue with the information available.

- To appeal either the hearing panel's decision or the sanctions determined by the Dean of Students.

- To be notified, in writing, of the case resolution – including the outcome of the appeal.

- To understand that information collected in this process may be subpoenaed in criminal or civil proceedings.

22.    In addition, the respondent and the complainant are entitled to have a supporter present during any meetings regarding the process.    See Columbia University's Gender-Based Misconduct Policies for Students, p. 13.

23.    According to Columbia University's Confidentiality, Privacy, & Non-Retaliation Policy:

> **The University will make all reasonable efforts to maintain the confidentiality and privacy of parties involved in gender-based misconduct investigations**, restricting information to those with a legitimate need to know. Individuals participating in an investigation, proceeding, or hearing are encouraged to maintain the privacy of the process in order to assist the office in conducting a thorough, fair, and accurate investigation. Individuals are also encouraged to seek appropriate administrative support on-campus. Strictly confidential on-campus resources include counseling services, medical care providers, the Rape Crisis/Anti-Violence Support Center, and clergy members. All other University administrators, such as faculty and advising staff, cannot promise strict confidentiality but can provide private support.

11

(emphasis added).

24.     In the Fall of 2012, John Doe traveled from Jacksonville, Florida to Morningside Heights, New York to join the class of 2016 at Columbia University.

## II. John Doe's Time At Columbia University, His Relationship to Jane Doe & The Evening Of May 12, 2013

25.     Shortly after starting his freshman year at Columbia University, John Doe became a member of Columbia University's crew team.  John Doe excelled at the sport and by his sophomore year, he became a varsity crew team member.

26.     John Doe and Jane Doe met at the beginning of their freshman year at Columbia University in August 2012.

27.     During the first semester of their freshman year, Jane Doe was dating John Doe's roommate, Colin Ross.  John Doe, Mr. Ross and Jane Doe all lived on the same floor of the residence hall, Carman Hall.  John Doe was also fairly close to Jane Doe's roommate, Zoe Wood, and often spent time in her room hanging out.

28.     Jane Doe and John Doe often spent time together in the same circle of friends.  Jane Doe and John Doe interacted nearly on a daily basis and spent time together on the weekends at social outings and dinners.

29.     On the evening of May 12, 2013, John Doe was studying for his Statistics final in the lounge of the 7th floor of Carman Hall.  It was 10:00 p.m. and nobody else was present in the lounge.  After some hours of studying, a fellow

Columbia University student and friend, Trevor Bell, who was accompanied by his girlfriend, Sidney Brinson, entered Carman Hall and sat down just outside the lounge.

30.    At approximately 1:00 a.m. on May 13, 2013, Jane Doe stepped off the elevator on the 7th floor and walked down towards the lounge.  Jane Doe sat and talked to Mr. Bell for some time while John Doe continued to study.

31.    Somewhere between 10 to 20 minutes later, Mr. Bell and Ms. Brinson left the 7th floor and Jane Doe came into the lounge and sat next to John Doe to talk. John Doe stopped studying while they chatted about school and summer plans. Jane Doe and John Doe talked until approximately 2:30 a.m.

32.    Feeling the need for fresh air and to stretch out his legs, John Doe suggested to Jane Doe that they go for a walk outside.  Jane Doe agreed and walked with John Doe down Broadway about fourteen (14) city blocks, then turned around and walked back to Carman Hall.  During their walk, they talked about the past year of school and their adjustments to college and living away from home.  Their walk lasted approximately one hour.

33.    Upon their return to Carman Hall, they went back into the lounge on the 7th floor and continued to talk while John Doe gathered his books.  At some

13

point, the topic of "hooking up" instead of going to bed came up, and Jane Doe and John Doe began to flirt with each other.

34.     Cognizant of the fact that they both had roommates who were fast asleep in their respective dormitory rooms, Jane Doe directed that they go to the bathroom located within her suite as a viable option for their sexual encounter.  In fact, Jane Doe insisted that they go to her suite, instead of John Doe's, because her ex-boyfriend was John Doe's roommate.

35.     John Doe followed Jane Doe to her suite room and, along the way, they stopped by John Doe's room to drop off his bag.  As they reached Jane Doe's suite room door, she invited John Doe into the bathroom and he followed her inside. Thereafter, Jane Doe directed John Doe to wait in the bathroom while she went into her bedroom to retrieve a condom.  Jane Doe came back into the bathroom and undressed herself in front of Plaintiff John Doe.  Jane Doe and John Doe proceeded to engage in sexual intercourse in the bathroom.

36.     Following their sexual activity, Jane Doe excused herself to take a shower and John Doe left to go back to his room to sleep.

### III.   The Weeks And Months Following The Evening of May 12

37.     A few days following the Evening of May 12, Jane Doe contacted John Doe via text message to convey her concern that their one evening of sexual activity

14

would have a social impact within their shared circle of friends and social circles, should anyone in the group found out.  John Doe advised that he did not believe it would matter all that much since neither John Doe nor Jane Doe were concerned about her ex-boyfriend's opinion and that their friends were mature enough to handle the news.  Jane Doe agreed and the conversation ended.

38.     Nearly two weeks after the Evening of May 12, Jane Doe contacted John Doe again and expressed doubt about engaging in sexual activity with John Doe on May 12, 2013, again noting she was uncomfortable with how it would appear to everyone else.

39.     During this time, John Doe had a conversation about the Evening of May 12 with Claire Kao, John Doe's resident adviser.  John Doe and Ms. Kao often spoke to each other on a regular basis about things in general.  Ms. Kao informed John Doe that she wanted to discuss the Evening of May 12 with John Doe and was advised that John Doe and Jane Doe engaged in consensual sexual intercourse on May 12, 2013.  Ms. Kao informed him that Jane Doe had approached her to discuss the Evening of May 12 in confidence, but that she was required by state law to report it to Columbia University.

40.     Notwithstanding the foregoing, no report was made at that time.

41.   In or about May 2013, John Doe and Jane Doe left for summer vacation break.

## IV.   Defendant Columbia's Mishandling Of Jane Doe's Complaint About The Evening of May 12

42.   On September 24, 2013, nearly five (5) months following the Evening of May 12, Rosalie Siler, Columbia University's Assistant Director for Gender-Based and Sexual Misconduct at the time, contacted John Doe to advise him that a fellow student had made allegations of sexual assault against John Doe on May 12, 2013.  Ms. Siler advised John Doe to come in for a meeting.

43.   The following day, John Doe met with Ms. Siler where she handed John Doe a formal written notice, dated September 24, 2013, which stated that John Doe was being charged with "Non-Consensual Sexual Intercourse" in violation of the Gender-Based Misconduct Policies for Students.  Furthermore, John Doe was advised that Columbia University had issued a "no contact" order against John Doe with respect to Jane Doe.  Also, John Doe's access to residence halls on campus was now restricted due to the accusations.  John Doe was advised that he was entitled access to the on-campus Counseling & Psychological Services.  Other than that, John Doe was not advised of any other source of support during the disciplinary process.

16

44.     John Doe was utterly blindsided by the allegations, as he had engaged in clearly consensual activity with Jane Doe, at her invitation, on the evening of May 12, 2013 and advised Columbia University administrators as such.

45.     According to Columbia University's Gender-Based Misconduct Policies for Students, "Sexual Assault" is defined as follows:

> **Sexual assault - non-consensual sexual intercourse.** Any form of sexual intercourse (anal, oral, or vaginal), however slight, with any object ***without consent***. Intercourse means: vaginal penetration (however slight) by a penis, object, tongue, or finger; anal penetration by a penis, object, tongue, or finger; and oral copulation (mouth to genital contact or genital to mouth contact.

(emphasis added).

46.     To determine whether sexual intercourse was without consent, the Columbia University's Gender-Based Misconduct Policies for Students states, in relevant part:

> **Consent**. The presence of consent involves explicit communication and mutual approval for the act in which the parties are/were involved.
>
> A sexual encounter is considered consensual when individuals willingly and knowingly engage in sexual activity.
>
> Consent cannot be procured by the use of physical force, compelling threats, intimidating behavior, or coercion.
>
> The use of coercion can involve the use of pressure, manipulation, substances, and/or force. Ignoring the objections of another person or pressuring them is a form of coercion.

17

> Knowingly engaging in sexual activity with someone who is incapacitated (by alcohol or drug use, unconsciousness, disability, or other forms of helplessness) does not constitute consent and is a violation of policy. Incapacitation is a state where one cannot make a rational, reasonable decision because they lack the ability to understand their decision. Incapacity can result from a person's disability, involuntary physical constraint, sleep, or consumption of alcohol, or and other drugs.
>
> Consent to one form of sexual activity does not imply consent to other forms of sexual activity. Previous relationships or previous consent for sexual activity cannot imply consent to sexual activity on a different occasion.
>
> Silence cannot be interpreted as consent.

47.     On September 25, 2013, John Doe met with Title IX investigator, Jilleian Sessions-Stackhouse, for the purpose of providing his account of the evening of May 12, 2013 ("Evening of May 12"). John Doe mentioned the existence of several witnesses who were present at the 7th floor lounge of Carman Hall on the evening in question; some of whom he knew by name and others who he did not. However, Ms. Sessions-Stackhouse failed to question him about such witnesses or conduct an investigation into such witnesses or follow up on their identity. At all times, John Doe was under the impression that Ms. Sessions-Stackhouse would investigate and follow up on John Doe's account of the evening once he conveyed his side of the story; as it turns out, that never happened.

48.    Ms. Sessions-Stackhouse is not an independent fact finder or disinterested party with any specialized training; she is employed by Columbia University and her role is essentially one of prosecuting sexual assault on campus. As such, Ms. Sessions-Stackhouse's line of questioning was more akin to cross-examination calculated to illicit a confession from John Doe, it was decidedly not an objective attempt to factually reconstruct an event.   The interview was not recorded; Ms. Sessions-Stackhouse took handwritten notes of her interview with John Doe.   Instead of performing an objective interview to identify witnesses, events and timelines, Ms. Sessions-Stackhouse only took notes on what she deemed important and disregarded everything else John Doe stated.  In fact, having worked for a women's resource center in the past, Ms. Sessions-Stackhouse does not come from a gender-neutral background, yet she is charged with creating the narrative account that is eventually adopted by the hearing panel.

49.    In stark contrast, upon information and belief, Ms. Sessions-Stackhouse took a narrative account of the Evening of May 12 from Jane Doe without leading questions and without hostility on the basis of Jane Doe's gender as the female accuser.

50.    Ms. Sessions-Stackhouse's failure to investigate or follow up on the identity of the witnesses who were present at the 7th floor lounge of Carman Hall

19

that evening was a material error and did not reflect a rational decision, but rather an anti-male biased decision, considering that the proof of the charge of sexual assault, by definition, requires a finding that the sexual intercourse was without consent, which includes the use of force, threats, coercion, alcohol or drugs. John Doe identified several witnesses who could attest to the <u>absence</u> of force, threats, coercion, alcohol or drugs on the Evening of May 12. Those witnesses were ignored in order to protect a false, anti-male biased narrative.

51.    At no time did Ms. Sessions-Stackhouse advise John Doe that he could submit his own written statement to her or to the hearing panel.

52.    At no time did Ms. Sessions-Stackhouse advise John Doe that he was entitled to a supporter during any meetings regarding the student conduct process.

53.    Upon information and belief, Jane Doe was treated with more sensitivity on the basis of her female gender and received thorough advisements of the resources available to her during the conduct process, including the right to submit a written statement to the investigator and to the panel, and her right to have a supporter present during the conduct process.

54.    At John Doe's request, on October 21, 2013, John Doe met with Ms. Siler again to advise her that Jane Doe's friends, some of which were not part of their mutual group of friends, had harassed and assaulted John Doe on campus on

the basis of his gender as a male accused of sexual assault.  However, Ms. Siler did

not take John Doe's complaint of gender-based harassment seriously and quickly

dismissed same.

55.    The following day, on October 22, 2013, John Doe met with Ms.

Sessions-Stackhouse to review her handwritten notes from their September 24,

2013 meeting.   Much to his distress, John Doe observed that Ms. Sessions-

Stackhouse's notes inaccurately and inadequately paraphrased John Doe's verbal

account of the events of May 12, 2013.   Thus, John Doe attempted to make

numerous corrections to correct the grossly inaccurate account.  Still dissatisfied,

Ms. Sessions-Stackhouse did not leave John Doe with any other choice but to

accept the account as written.  During this meeting, John Doe also advised Ms.

Sessions-Stackhouse that a fellow student and friend of Jane Doe's, India Knight,

had information pertinent to the case.    Notwithstanding her duty to investigate,

gather evidence including witness statements, and otherwise examine all aspects of

the event in question with respect to the charges, Ms. Sessions-Stackhouse had no

prior knowledge of Ms. Knight and did not even interview Ms. Knight until John

Doe specifically mentioned her at this second meeting.

56.    Upon information and belief, due to an anti-male bias and desire to

create a narrative to convict the male, Ms. Sessions-Stackhouse's notes did not

present objective statements of the facts; instead, her notes made conclusive and presumptive statements about John Doe's responsibility for the charges and appeared to wholly support Jane Doe's version of the Evening of May 12, 2013 without any consideration of critical and relevant details provided by John Doe.

57.     That same day, John Doe emailed Ms. Siler for permission to access Hartley Residence Hall to meet with an on-campus psychologist.   However, the Counseling and Psychological Services ultimately canceled the meeting without cause.   This was the second time that the Counseling and Psychological Services had canceled a meeting with John Doe, notwithstanding his attempts to meet with the on-campus psychologist.

58.     Instead, on October 25, 2013, John Doe met with Dr. Corey Frank in the Columbia Center for Psychological Counseling, on the advisement of John Doe's coach, Nich Lee Parker.   Based on that visit, Dr. Frank noted that John Doe presented with near suicidal thoughts due, in part, to the stress he was undergoing as a result of the aftermath of Jane Doe's false accusations of sexual misconduct.

59.     On November 22, 2013, Ms. Sessions-Stackhouse called John Doe to ask follow-up questions about his statement of the events of May 12, 2013.   When asked if Jane Doe appeared intoxicated or under the influence of any drugs, John Doe stated, "no".   Ms. Sessions-Stackhouse asked John Doe how he knew whether

or not Jane Doe was intoxicated or under the influence of drugs.   John Doe explained that, due to their history and friendship, he has been present while Jane Doe was drinking and using drugs on multiple occasions and that Jane Doe did not act in accordance with such behavior on the evening of May 12, 2013.  As a result of interacting with Jane Doe (while she was her usual self) countless times throughout the year, John Doe stated that she was acting normally as her usual self on the night of the Evening of May 12.

60.    On January 23, 2014, Interim Assistant Director, Deputy Title IX Coordinator, Virginia Ryan (Rosalie Siler's replacement), contacted John Doe to meet with her and review the completed investigative report by Ms. Sessions-Stackhouse.

61.    On January 25, 2014, John Doe met with Ms. Ryan to review the investigation report.   It was clear to Plaintiff John Doe that Ms. Sessions-Stackhouse had, once again, disregarded John Doe's advisement of Jane Doe's clear expressed verbal consent on the night of the Evening of May 12.   Ms. Sessions-Stackhouse had also failed to follow through with and reconcile the conflicting information provided by Ms. Knight and Jane Doe on Jane Doe's motivations and account of the night of the Evening of May 12.

62.     Again, John Doe attempted to correct multiple mistakes that Ms. Sessions-Stackhouse failed to correct from their last meeting in October.  Instead of correcting her written mistakes, Ms. Sessions-Stackhouse continued to pursue an admission of "guilt" from John Doe by her persistent line of questioning and disregard for his explanations.   Among other flaws with the report, noticeably absent from the investigation report was the mention of any police report or health examination/rape kit made in connection with the Evening of May 12, i.e. any supporting evidence, other than Jane Doe's "say so" taken at face value.

63.     Further absent from the investigation report was any mention of Ms. Sessions-Stackhouse's interview of or receipt of any statement from Trevor Bell (who was present in the lounge on the evening of the Evening of May 12), Sidney Brinson (also present to observe Jane Doe on the evening of the Evening of May 12) or Zoe Wood (Jane Doe's roommate at the time of the Evening of May 12). Furthermore, the investigation report did not acknowledge the fact that Jane Doe did not admit herself to the campus health center or any local hospital.

64.     Upon information and belief, the investigation report did not reflect any statements from witnesses who personally observed Jane Doe's words or actions before and after the Evening of May 12, 2013.   In fact, Ms. Sessions-Stackhouse did not interview Jane Doe's own roommate, Zoe Wood, who was

present in Jane Doe's dormitory room on the Evening of May 12, 2013 and who was able to witness Jane Doe's words and actions on a daily basis. The interaction between John Doe and Jane Doe on the Evening of May 12, 2013 amounts to "he said, she said." Ms. Sessions-Stackhouse, however, failed to interview any witnesses in support of John Doe's defense and only followed up on Jane Doe's version of the Evening of May 12, 2013. Upon information and belief, Ms. Sessions-Stackhouse's adopted Jane Doe's version of the Evening of May 12 in her report to the exclusion of important details provided by John Doe. Upon information and belief, Ms. Sessions-Stackhouse's actions were based on an anti-male gender bias.

65. Ms. Ryan also gave John Doe a form to state his response to the incident report and the accusations and attempted to explain the process following each response. John Doe returned this form on January 29, 2014.

66. Between January 31, 2014 and February 4, 2014, Ms. Ryan provided John Doe the details of the hearing date, time and place, and gave John Doe a list of the panelists. The hearing date was pushed back two days due to undisclosed "scheduling conflicts", not caused by John Doe.

67.    At no point in time during the investigative process did any Columbia University administrator advise John Doe that he was entitled to seek advice and counsel from his Dean of Students.

## V.    Columbia University Has Been Under Fire
## For Its Handling Of Sexual Assault Complaints

68.    Various Columbia University student organizations have alleged that the school is not being firm enough in the disciplinary process on cases involving alleged sexual misconduct by female students against male students at Columbia University.

69.    As early as December 11, 2013, Columbia University was subjected to public scrutiny in a New York Post article, entitled, "Columbia drops ball on jock 'rapist' probe: students."   Several Columbia University female students were anonymously interviewed for comment on their view of the institution's mishandling of their sexual assault complaints, citing Columbia University's failure to act with expediency in investigating the complaints, lenient sanctions and overall tenor of "dismissal" with regard to the serious nature of the complaints.  As a result, the New York Post article stated:

> The University's Presidential Advisory Committee on Sexual Assault is planning to meet with the CU Student Dems and other student leaders who have raised issues about additional disclosures in order to learn more directly about student concerns, share perspectives, and explore possible next steps.

26

70.     The student organization, Columbia University Democrats, has led the charge on campus in criticizing Columbia University's handling of sexual assault and has called for greater reforms.  Columbia University Democrats has provided input on the issue of sexual assault at Columbia University in articles on such perceived missteps and inadequacies.

71.     For example, Sarah Weinstein, Membership Director of the Columbia University Democrats has written opinion articles on the issue of male students being found guilty of rape at their respective colleges and universities and has called for the increase in transparency at Columbia University on the statistics of what she terms, "campus assault".

72.     Further, Ms. Weinstein has spearheaded a Columbia University College Democrats Petition to request statistics on the sanctions applied to those found responsible for sexual assaults, rapes and incidents of gender-based misconduct reported at Columbia University.  Ms. Weinstein has been quoted in such articles as stating, "My peers and I have said many times that we want to make sure that what's happening at Yale isn't happening here at Columbia" and "We've placed an emphasis on the light sanctions applied to the individuals found guilty of rape at Yale, revealed by those statistics."

73.    Following suit, an independent, Columbia University student-run newspaper, The Blue and the White, featured a two-part series, "'Accessible, Prompt, and Equitable'? An Examination of Sexual Assault at Columbia" and "'Fallen Through the Cracks' An Examination of Sexual Assault at Columbia, Pt. 2", on January 23, 2014.  The articles cast grave doubt on Columbia University's handling of sexual assault complaints and discuss the experiences of three alleged victims of sexual assault, in an effort to highlight how the university's internal investigation allowed the accused student athlete to escape punishment.

74.    The articles also note the inadequate investigation conducted by the Title IX investigator, Jilleian Sessions-Stackhouse (who replaced Rosalie Siler), and insensitive questioning by the hearing panel members.

75.    In February 2014, Columbia University's President, Lee Bollinger, promised to hold a Town Hall meeting on Columbia University's handling of sexual misconduct and scheduled the meeting for March 14, 2014 at Jerome Greene Hall.   The expected list of attendees included, but was not limited to, Senior Associate Dean of Judicial Affairs, Jeri Henry, Columbia College Dean, James Valenti, and Dean of Student Affairs, Terry Martinez.

76.    More recently, on April 23, 2014, in a Twitter post by Anna Bahr, editor of The Blue and the White, Ms. Bahr "tweeted" the statement, "Columbia

proves that it takes sexual assault seriously with this cake it is serving in a dining hall," together with a photograph of a sheet cake bearing the inscription, "Sexual Violence Prevention", which was served in the dining hall at Columbia University.

77.    Upon information and belief, the following day, on April 24, 2014, twenty-three (23) students from Columbia University and Barnard College filed complaints for violations of Title IX, Title II, and The Clery Act with the U.S. Education Department alleging that Columbia University and Barnard College mishandled incidents of sexual assault and misconduct on campus.

78.    It was in this environment that John Doe's disciplinary hearing was maladministered on February 12, 2014.

## VI.    The Disciplinary Hearing

79.    On February 12, 2014, the disciplinary hearing on John Doe's alleged violation of Columbia University's Gender-Based Misconduct Policies for Students convened at around 8:00 p.m. ("Hearing").

80.    Both John Doe and Jane Doe were allowed to be accompanied by a support person to the Hearing.  John Doe was accompanied by his roommate that year (2013-2014 academic year), Conor Murphy.  Jane Doe attended the Hearing with Sarah Weinstein, Membership Director of the Columbia University Democrats.

81.    Upon information and belief, Ms. Weinstein and Jane Doe are not friends and have no known relationship to each other prior to the date of the Hearing.    Ms. Weinstein's attendance at the Hearing was certainly not a mere coincidence.

82.    Also present at the Hearing were Ms. Ryan, Ms. Ryan's assistant and the three (3) panelists, Morgan Murray (Director of Office of Disability Services at Barnard College), Frank Cirioni (Associate Director for Residential Life and Housing at Barnard College) and Suma Setty (Graduate student at Mailman School of Public Health at Columbia University).

83.    John Doe was not entitled to have legal representation at the Hearing.

84.    There were three (3) separate rooms set up for the Hearing to keep everyone separate; one room was for the panelists, the second room was for John Doe, and the third room was for Jane Doe. In each room, a television was set up with a live video feed of the Hearing so that each participant had the opportunity to watch what was being said at all times.

85.    At the start of the Hearing, the panelists asked John Doe to make a statement.  However, not having been previously advised by anyone at Columbia University about this part of the process or what the expectations were for his

statement, John Doe had nothing prepared and merely stated that he "did nothing wrong".

86.     While the Hearing was in session, John Doe and Jane Doe alternated entering the first room to stand before the panelists to state their side of the case. While Jane Doe told her version of the Evening of May 12, John Doe took notes in his room and prepared questions for her cross-examination.

87.     Only unsworn "testimony" was given by Jane Doe and the student witness.  The Panel took such unsworn testimony at face value.

88.     At no time, did Plaintiff John Doe receive a supporter for his rights throughout the investigation or Hearing.  At no point in time did any Columbia University administrator advise John Doe that he had the right to a supporter.

89.     At the Hearing, Ms. Sessions-Stackhouse's investigation report was provided to the Panel for their review and entered into evidence, thus wrongly treating the false, anti-male narrative as evidence of what happened.

90.     In accordance with his rights under Columbia University's policies, John Doe mentioned the existence of several witnesses who were present at the 7th floor lounge of Carman Hall on the evening in question.  However, due to Ms. Sessions-Stackhouse's failure to perform a thorough investigation into such witnesses, no witnesses appeared at the Hearing to support John Doe's defense.

31

91.    In defense of the formal charges brought against him, John Doe submitted questions to the panelists to ask Jane Doe in order to expose her lack of credibility with regard to the false charge of sexual misconduct.   However, the Panel did not allow John Doe to exhaust his list of questions, claiming that his questions were "irrelevant".

92.    According to Columbia University's policies regarding the disciplinary process, "[w]itnesses may not directly participate in the disciplinary process, but may submit a written statement documenting his/her account as it directly relates to the incident".   At no point during the investigation process or the Hearing did Defendant Columbia obtain or afford John Doe the right to submit witness statements in support of his defense as it related to the Evening of May 12.

93.    According to Columbia University's policies regarding the disciplinary process, "[b]ecause the determination of responsibility is based on a student's behavior and not his/her character, character references are unnecessary". However, the credibility and character of the accuser is critical when faced with a charge that amounts to nothing more than "he said, she said".

94.    Upon information and belief, Columbia University erroneously placed the entire burden on John Doe to prove his innocence, instead of setting forth

competent evidence such as eyewitness testimony to demonstrate how John Doe allegedly engaged in sexual intercourse with Jane Doe without her consent.

95.    The Hearing was less than two hours and ended by 10:00 p.m.

**VII.   Sanctions**

96.    On February 18, 2014, John Doe met with Ms. Ryan to receive formal notice of the result of the Hearing.  The panelists found John Doe "Responsible" for the charge of sexual assault: non-consensual sexual intercourse with Jane Doe ("Decision").  In the Decision, Columbia University stated, in relevant part:

> The Panel determined that it was more likely than not that you did not have consent to engage in sexual intercourse with the Complainant. Specifically, the Panel found that it is more likely than not that you directed unreasonable pressure for sexual activity toward the Complainant over a period of weeks.  The Panel determined this pressure constituted coercion, and therefore the sexual intercourse was without consent.

97.    The Decision was not based on the preponderance of the evidence, just Jane Doe's uncorroborated "say so" that was effectively contradicted by the lack of any contemporaneous police report or medical evidence.  There was no rational basis for deciding in favor of Jane Doe, as the female accuser, involving an interaction that involves nothing more than "he said, she said."  Furthermore, Columbia University failed to receive evidence from at least three (3) individuals, Trevor Bell, Sidney Brinson, and Zoe Wood, who had occasion to witness Jane Doe

33

in the weeks before and night of the Evening of May 12. The Decision was rendered on the basis of gender discrimination against John Doe, as the male accused.

98.    John Doe was advised that Dean Terry Martinez would be rendering a sanction within the next five (5) business days.

99.    On February 26, 2014, John Doe met with Dean Jeri Henry and John Doe's advisor, Chad Gifford, to receive the sanction issued by Dean Terry Martinez. At that time, he was advised that Columbia University was issuing John Doe an order of suspension from Columbia University until Fall 2015 (the "Sanction"). However, Defendant Columbia refused to credit John Doe for his class attendance in the Spring of 2014, which effectively made John Doe's suspension equivalent to 1.5 years.

100.   That same day, Jane Doe spotted John Doe as he was leaving Wien Residence Hall, which is where the Gender Based Misconduct office is located. Jane Doe appeared to be entering Wien Residence Hall and she called out at John Doe to get his attention. John Doe turned but did not give any response. Jane Doe stated that she was "sorry" and that was going to go inside to get the punishment lessened. John Doe did not respond and turned to walk away.

34

101.   According to Columbia University's policies regarding the disciplinary process, "[i]f a student is found responsible for a policy violation, sanctions will be issued in consideration of the specific circumstances of the case, institutional precedent, disciplinary history, aggravating circumstances and community impact". Notwithstanding the fact that John Doe was a student in good standing and had no history of sexual misconduct or any other disciplinary record, Columbia University meted out the severe sanction of a nearly two-year suspension.

102.   John Doe was advised of his right to appeal the Decision and Sanction within five (5) business days.

## VIII. **Appeal of the Sanction**

103.   Following John Doe's receipt of the Decision and Sanction, John Doe received an email from editor of the Columbia University student-run newspaper, The Blue and the White, Anna Bahr, who somehow received notice of the Decision and Sanction regarding John Doe.  Ms. Bahr emailed John Doe to interview him about his feelings on the Sanction and his perspective of the proceedings.  Ms. Bahr's request went ignored and unanswered.  John Doe was appalled at Columbia University's blatant violation of its very own confidentiality policies.

104.   On or about March 3, 2014, John Doe submitted his appeal of the Decision and Sanction outlining Columbia University's procedural errors, together

with exonerating evidence of doctor notes, emails and interviews with key student witnesses who Ms. Sessions-Stackhouse failed to interview and/or include in her investigation report, and who were never included (in any manner) at the Hearing. In his appeal, John Doe also identified how Columbia University facilitated a breach of confidentiality in violation of its own policies when the outcome of John Doe's Decision and Sanction was leaked to Anna Bahr.

105.   As it turns out, Jane Doe also submitted an appeal to reduce the severity of the Sanction.

106.   Notwithstanding, on March 10, 2014, Dean Valentini issued his denial of John Doe's appeal on the following grounds: (i) the failure to interview key witnesses identified by John Doe was within Ms. Sessions-Stackhouse's discretion; (ii) such key witnesses were not raised with Ms. Sessions-Stackhouse and were "raised for the first time on appeal"; (iii) John Doe's behavior was found to be "coercive" and was committed outside the purview of other witnesses, and, thus, such witnesses' testimonies were insufficient; (iv) the evidence John Doe submitted on appeal "threatened the integrity of the process" and, in any event, was available at the time of the Hearing and not "new evidence"; and (v) sexual assault is egregious and the sanction of a nearly two-year suspension is appropriate.  Dean Valentini's denial of the appeal thus underscored Columbia University's reliance on

36

a false anti-male narrative of an investigator who is not a percipient witness and Columbia University's anti-male prosecutorial mind set.

107.    There was no rational basis for Dean Valentini's denial of John Doe's appeal, and such denial was arbitrary and capricious on the grounds that: (i) under Columbia University's new changes to its policies in 2011, the Title IX Investigator's duty is to interview witnesses and pertinent evidence; a role that once belonged solely to the student; (ii) such key witnesses were identified by John Doe during the investigation to Ms. Sessions-Stackhouse's; (iii) given the testimony, there was no basis for finding John Doe's behavior "coercive" and no basis was ever provided by the panelists or Dean Valentini; (iv) the evidence submitted on appeal consisted of an email from The Blue and the White editor, Ms. Bahr to demonstrate Columbia University's breach of confidentiality, John Doe's doctor's notes about his psychological health, and interviews with key witnesses who were ignored in the investigation and Hearing process; and (v) the Sanction and appeal failed to take into account other considerations identified in Columbia University's policies on sanctions, such as John Doe's lack of history of sexual misconduct or any other disciplinary record and Jane Doe's appeal to reduce the severity of the Sanction.

108.   On March 11, 2014, Dean Valentini issued his denial of Jane Doe's appeal to reduce the severity of the Sanction.

109.   Columbia University policies effectuate a failure of due process for the student population, especially the male student population, in their current state because they are set up to encourage and facilitate the reporting of false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused.

## IX.   John Doe's Entire Future is Severely Damaged by Defendant Columbia's Actions

110.   As a result of Defendant Columbia's actions, John Doe's entire academic career is ruined and, without a college education, his overall economic future is completely compromised.

111.   Currently, John Doe's education is at a standstill as a result of Defendant Columbia's sanction of such a lengthy suspension through Fall 2015.

112.   Even though John Doe may be allowed to return to Defendant Columbia in the future, his academic and disciplinary record is irrevocably and irreversibly tarnished and will not withstand scrutiny by any transfer to another educational institution, including graduate studies.

113.   Furthermore, John Doe's crew team membership has been revoked and his chances of competing in the future have been compromised as a result of his inability to maintain his training.

114.   As a result of Defendant Columbia's actions, John Doe's parents' financial resources used to provide John Doe with an Ivy League education have been squandered.

115.   As a result of Defendant Columbia's actions, John Doe must undergo psychological counseling on a weekly basis.

116.   Any attempt to move on with his future in the face of Columbia University's arbitrary and capricious decision will be met with great resistance and little success; it is a known fact that the likelihood of his acceptance to a transfer college of the same caliber as Columbia University is bleak, and the same outcome can be expected for John Doe's future graduate applications in light of high applicant numbers and stiff competition.

117.   Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to John Doe, with no end in sight. John Doe seeks redress from this Court to undo the wrongs occasioned by Columbia University on his education and future.

## AS AND FOR THE FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972

118.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

119.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

120.   Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

121.   Upon information and belief, Defendant Columbia receives nearly $645,000,000 in federal funding for research and development.

122.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. §

40

54.135(b) (Dep't of Justice) (emphasis added).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

123.   The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"accord[] due process to both parties involved..."*[3]

124.   The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint..."[4]

---

[2] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

[3] *Id.* at 22 (emphasis added).

[4] *Id.* at 20.

125.   A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [5]

126.   Based on the foregoing, *supra*, at ¶¶ 42-67, 79-95, Defendant Columbia has deprived John Doe, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant Columbia's guidelines and regulations.

127.   Based on the foregoing, *supra*, at ¶¶ 42-67, 79-95, Defendant Columbia conducted its investigation of the Evening of May 12, and subsequent Hearing, in a manner that was biased against the male being accused.   From the outset, Ms. Sessions-Stackhouse's Final Investigation Notes were slanted in favor of Jane Doe and took her statements at face-value.   Absent from Ms. Sessions-Stackhouse's report is the mention of (or explanation for its absence) any police report or health examination/rape kit made in connection with the Evening of May 12.

---

[5] *Id.* at 21.

128.  Ms. Sessions-Stackhouse's failure to interview any witnesses in support of John Doe's defense demonstrates Columbia University's favorable treatment of Jane Doe on the basis of her gender.

129.  Columbia University has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt.  Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Columbia University on the basis of his sex.

130.  At the Hearing, Defendant Columbia freely allowed Jane Doe to escape critical questioning by crying on the witness stand, and was completely dismissive of John Doe's attempts to engage in meaningful cross-examination of Jane Doe and challenge of her credibility on the issues of consent and her alleged drug-induced state on the evening of the Evening of May 12.  Additionally, no evidence was presented in support of Jane Doe's claim that John Doe "coerced" her to engage in sexual intercourse over a period of weeks prior to the Evening of May 12.  Notwithstanding, Defendant Columbia credited Jane Doe's claim that she was coerced over John Doe's claim that he did not coerce her, on the basis of gender discrimination against the male accused.  Indeed, the lack of any evidence of a contemporaneous police report or medical evidence contradicted Jane Doe's claim.

43

131.   Defendant Columbia had no intention of following its own policies and procedures for John Doe as the male accused of sexual assault when it found John Doe responsible for sexual assault in the face of its outright failure to interview any witnesses in support of John Doe's defense and failure to present any evidence in support of the claim that Jane Doe was allegedly coerced over a period of weeks to have sexual intercourse with John Doe, except for Jane Doe's say-so.

132.   Defendant Columbia had no intention of following its own policies and procedures when it failed to follow up on John Doe's October 21, 2013 gender-based harassment complaint involving Jane Doe's friends, and quickly dismissed same.

133.   Defendant Columbia's stated policies and procedures, together with its violations thereof only with respect to John Doe as the male accused of sexual assault, demonstrates Defendant Columbia's gender-biased practices with respect to males accused of sexual assault at Columbia University.

134.   In fact, on August 15, 2014, Defendant Columbia issued a new University Gender-Based Misconduct Policy for Students and stated in relevant part, "Our goals underlying the new policy are principally these: to strengthen confidence in the University's handling of reports of sexual assault and other gender-based misconduct, to ensure fairness for all parties involved, and to provide

44

more assistance to students in need…Throughout the coming year, we will continue to discuss ways to improve our policy."

135.   Perhaps one of the most significant changes in its policies includes Columbia University's new definition of "Consent," which now states that "someone who is incapacitated (by alcohol or drug use, unconsciousness, disability, or other forms of helplessness) cannot consent," "consent can be withdrawn at any time," and when the use of drugs or alcohol is involved, Columbia University will examine the issue of consent "from the perspective of a reasonable person" and "whether the respondent reasonably should have known about the impact of alcohol and other drugs on the complainant's ability to give consent."

136.   Among the list of other new changes made to its admittedly deficient policies: (i) the complainant has the option to request that Columbia University forego an investigation; (ii) in certain cases, Columbia University will consider including "retired judges, lawyers or other individuals with relevant experience and special training" as part of the hearing panel; (iii) all panelists will receive "training from experts in the field at least once a year," including sensitivity training; (iv) both the complainant and the respondent will have the opportunity to suggest to the panelists questions to pose to each other and to witnesses; and (v) Columbia University lists "Ongoing Accommodations for Complainant" during the and after

the hearing process, including changing the complainant's academic schedule, moving the complainant's residences, etc.

137.   Based on the foregoing, *supra,* at ¶¶ 42-67, 79-95, Defendant Columbia imposed sanctions on John Doe that were disproportionate to the severity of the charges levied against him and without any consideration of his clean disciplinary record at Columbia University, and without providing any written summary for the basis therefor.

138.   Based on the foregoing, *supra,* at ¶¶ 42-67, 79-95, Defendant Columbia's guidelines and regulations are set up to disproportionately affect the male student population of the Columbia University community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

139.   Based on the foregoing, *supra,* at ¶¶ 42-67, 79-95, male respondents in sexual misconduct cases at Columbia University are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

140.   Based on the foregoing, *supra,* at ¶¶ 42-67, 79-95, Defendant Columbia's mishandling of the investigation, Hearing and sanctions determination was motivated solely by great criticism by the Columbia University Democrats,

negative public scrutiny and its desire to make an "example" out of John Doe as a student-athlete who has been "punished".

141.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR THE SECOND CAUSE OF ACTION**
**Violations of Title IX OCR Rules**

138.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

139.   The United States Department of Education Office for Civil Rights ("OCR") requires colleges that receive federal funds to adhere to Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex.

140.   OCR requires colleges to ensure that employees "likely to witness or receive reports of sexual harassment and violence" receiving training on practical information about how to identify and report sexual harassment and violence.

141.   OCR requires colleges to process complaints of sexual misconduct in accordance with its established procedures.

142.   OCR requires colleges to engage in "prompt, thorough, and impartial" investigations of allegations of sexual misconduct.

47

143. OCR requires colleges to designate a Title IX coordinator to oversee all Title IX complaints and identify and address any patterns or systemic problems that arise during the review of such complaints.

144. OCR requires colleges to ensure that their "Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the [college's] grievance procedures operate."

145. OCR requires colleges to utilize adequate, reliable, and impartial investigation of complaints, including an equal opportunity for both parties to present relevant witnesses and other evidence.

146. OCR requires colleges to afford to the complainant and the accused student similar and timely access to any information that will be used at the hearing.

147. OCR requires colleges to maintain documentation of all proceedings, which includes written findings of facts, transcripts or audio recordings.

148. OCR requires colleges to ensure that all employees are trained with respect to applicable confidentiality requirements.

149. OCR requires that all colleges "must provide due process to the alleged perpetrator."

150. Based on the foregoing, *supra,* at ¶¶ 42-67, 79-95, Defendant Columbia has deprived John Doe, on the basis of his sex, of his rights to due

process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant Columbia's guidelines and regulations.

151. Based on the foregoing, *supra,* at ¶¶ 42-67, 79-95, Defendant Columbia conducted its investigation of the Evening of May 12, and subsequent Hearing, in a manner that was biased against the male being accused. From the outset, Ms. Sessions-Stackhouse's Final Investigation Notes were slanted in favor of Jane Doe and took her statements at face-value. Absent from Ms. Sessions-Stackhouse's report is the mention of (or explanation for its absence) any police report or health examination/rape kit made in connection with the Evening of May 12.

152. Based on the foregoing, *supra,* at ¶¶ 42-67, 79-95, Defendant Columbia's mishandling of the investigation, Hearing and sanctions determination was motivated solely by great criticism by the Columbia University Democrats, negative public scrutiny and its desire to make an "example" out of John Doe as a student-athlete who has been "punished."

153. Ms. Sessions-Stackhouse's failure to interview any witnesses in support of John Doe's defense demonstrates Columbia University's favorable treatment of Jane Doe on the basis of her gender.

49

154.   At the Hearing, Defendant Columbia freely allowed Jane Doe to escape critical questioning by crying on the witness stand, and was completely dismissive of John Doe's attempts to engage in meaningful cross-examination of Jane Doe and challenge of her credibility on the issues of consent and her alleged drug-induced state on the evening of the Evening of May 12.   Additionally, no evidence was presented in support of Jane Doe's claim that John Doe "coerced" her to engage in sexual intercourse over a period of weeks prior to the Evening of May 12.   Notwithstanding, Defendant Columbia credited Jane Doe's claim that she was coerced over John Doe's claim that he did not coerce her, on the basis of gender discrimination against the male accused.   Indeed, the lack of any evidence of a contemporaneous police report or medical evidence contradicted Jane Doe's claim.

155.   Columbia University has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt.   Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Columbia University on the basis of his sex.

156.   Defendant Columbia's stated policies and procedures, together with its violations thereof only with respect to John Doe as the male accused of sexual

assault, demonstrates Defendant Columbia's gender-biased practices with respect to males accused of sexual assault at Columbia University.

157.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE THIRD CAUSE OF ACTION
### Breach of Contract

142.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

143.   Based on the aforementioned facts and circumstances, Defendant Columbia breached express and/or implied agreement(s) with John Doe.

144.   Defendant Columbia committed several breaches of its agreements with John Doe, including, without limitation:

"The University does not tolerate discrimination or harassment on the basis of membership in a Protected Class..." *Supra* ¶ 19 at 8.

"Columbia University, Barnard College, and Teachers College are committed to providing a learning environment free from gender-based discrimination and harassment." *Supra* ¶ 20 at 8.

Students who believe they have been subjected to gender-based discrimination or harassment are encouraged to report these incidents. Upon receiving a report, the University will respond promptly, equitably, and thoroughly. *Supra* ¶ 20 at 9.

The right "To be treated with respect, dignity, and sensitivity throughout the process." *Supra* ¶ 20 at 9.

The right "To a prompt and thorough investigation of the allegations." *Supra* ¶ 20 at 9.

The right "To confidentiality and privacy to the extent provided under applicable law. The University will make all reasonable efforts to ensure preservation of privacy, restricting information to those with a legitimate need to know." *Supra* ¶ 20 at 9.

"The University will make all reasonable efforts to maintain the confidentiality and privacy of parties involved in gender-based misconduct investigations, restricting information to those with a legitimate need to know." *Supra* ¶ 22 at 11.

145.   As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

146.   John Doe is entitled to recover damages for Defendant Columbia's breach of the express and/or implied contractual obligations described above.

147.   As a direct and proximate result of the above conduct, actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and athletic opportunities.

52

148.   Upon information and belief, Columbia University is currently under investigation by the U.S. Department of Education regarding its mishandling of sexual assault allegations.

149.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### Covenant of Good Faith and Fair Dealing

150.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

151.   Based on the aforementioned facts and circumstances, Defendant Columbia breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe by meting out a disproportionate sanction of a nearly two-year suspension against John Doe, notwithstanding the lack of evidence in support of Jane Doe's claim of sexual assault and, in the face of Jane Doe's own appeal to Columbia University to request a lesser sanction.

152.   As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

153. John Doe is entitled to recover damages for Defendant Columbia's breach of the express and/or implied contractual obligations described above.

154. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### Unfair or Deceptive Trade Practices

155. John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

156. Section 349(a) of the General Business Law provides consumer protection by declaring as unlawful "deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state".

157. Columbia University's Student Policies and Procedures on Discrimination and Harassment state, among other things:

> Columbia University is committed to providing a learning, living, and working environment free from discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members. **The University does not tolerate discrimination or harassment on the basis of membership in a Protected Class**, and it provides students who believe that they have been the subject of discrimination or harassment with mechanisms for seeking redress. Nothing in this policy shall abridge academic freedom or the University's educational mission. **All members of the University community are expected to adhere to the**

> **applicable policies, to cooperate with the procedures for responding to complaints of discrimination and harassment, and to report conduct or behavior they believe to be in violation of these policies to EOAA.** Management and supervisory personnel have a duty to act; they are responsible for taking reasonable and necessary action to **prevent discrimination and harassment and for responding promptly and thoroughly to any such claims.** University officers who learn of an allegation of gender-based misconduct, discrimination, or harassment have a duty to report the allegation to EOAA or Student Services for Gender-Based and Sexual Misconduct. All students are protected from retaliation for filing a complaint or assisting in an investigation under these policies. **Appropriate disciplinary action may be taken against any student or employee who violates these policies.**

(emphasis added).

158.   According to Columbia University's Gender-Based Misconduct Policies for Students:

> Columbia University, Barnard College, and Teachers College are committed to providing a learning environment **free from gender-based discrimination and harassment.** As such, the University does not tolerate any kind of gender-based discrimination or harassment, which includes sexual assault, sexual harassment, and gender-based harassment. The University community is committed to fostering a healthy and safe environment in which every member of the community can realize her or his fullest potential.
>
> Gender-based misconduct is a serious concern on college campuses throughout the country. To address this problem, the University provides educational and preventive programs, services for individuals who have been impacted by gender-based and sexual misconduct, and accessible, prompt, and equitable methods of investigation and resolution.

Students who believe they have been subjected to gender-based discrimination or harassment are encouraged to report these incidents. **Upon receiving a report, the University will respond promptly, equitably, and thoroughly.** In addition, the University will take steps to prevent the recurrence of the discrimination or harassment and correct its effects, if appropriate.

(emphasis added).

159.   Furthermore, Columbia University covenants to provide the following rights to "Respondents" (i.e. the accused student) in gender-based misconduct proceedings:

- To be treated with respect, dignity, and sensitivity throughout the process.

- To seek support services at the University.

- To confidentiality and privacy to the extent provided under applicable law.  The University will make all reasonable efforts to ensure preservation of privacy, restricting information to those with a legitimate need to know.

- To be informed of the University's Gender-Based Misconduct Policies and Procedures for Students.

- To a prompt and thorough investigation of the allegations.

- To an adequate amount of time to prepare for the hearing.  Participants shall be given at least five (5) calendar days' notice prior to the hearing except in rare circumstances.

- To review all applicable documents prior to the hearing in the Student Services for Gender-Based and Sexual Misconduct office.

- To challenge investigator(s) or any hearing panel member if a possible conflict of interest is present.

- The right to replace the student panelist with a dean or senior-level administrator if both parties agree.

- To be accompanied at the hearing by a supporter.

- To participate or decline to participate in the investigation or hearing panel process. However, the disciplinary process will continue with the information available, and not participating in the investigation may preclude participation in the hearing panel.

- To refrain from making self-incriminating statements. However, the disciplinary process will continue with the information available.

- To appeal either the hearing panel's decision or the sanctions determined by the Dean of Students.

- To be notified, in writing, of the case resolution – including the outcome of the appeal.

- To understand that information collected in this process may be subpoenaed in criminal or civil proceedings.

160.    According to Columbia University's Confidentiality, Privacy, & Non-

Retaliation Policy:

> **The University will make all reasonable efforts to maintain the confidentiality and privacy of parties involved in gender-based misconduct investigations**, restricting information to

those with a legitimate need to know. Individuals participating
in an investigation, proceeding, or hearing are encouraged to
maintain the privacy of the process in order to assist the office in
conducting a thorough, fair, and accurate investigation.
Individuals are also encouraged to seek appropriate
administrative support on-campus. Strictly confidential on-
campus resources include counseling services, medical care
providers, the Rape Crisis/Anti-Violence Support Center, and
clergy members. All other University administrators, such as
faculty and advising staff, cannot promise strict confidentiality
but can provide private support.

(emphasis added).

161.   Defendant Columbia has engaged in the following acts or practices

that are deceptive or misleading in a material way, or committed deceptive acts or

practices, which were aimed at the consumer public at large, that were a

representation or omission likely to mislead a reasonable consumer acting

reasonably under the circumstances:

    a.  by causing John Doe to believe that Defendant Columbia would
       follow its policies, copies of which were provided to John Doe
       and are also available on Defendant Columbia's Internet
       website; and

    b.  by causing John Doe to believe that if he paid tuition and fees to
       Defendant Columbia, that Defendant Columbia would uphold its
       obligations, covenants and warranties to John Doe described in
       its policies.

162.   Defendant Columbia had no intention of following its own policies and

procedures for John Doe as the male accused of sexual assault when it found John

Doe responsible for sexual assault in the face of its outright failure to interview any witnesses in support of John Doe's defense and failure to present any evidence in support of the claim that Jane Doe was allegedly coerced over a period of weeks to have sexual intercourse with John Doe, except for Jane Doe's say-so.

163.   Defendant Columbia had no intention of following its own policies and procedures when it failed to follow up on John Doe's October 21, 2013 gender-based harassment complaint involving Jane Doe's friends, and quickly dismissed same.

164.   Defendant Columbia's stated policies and procedures, together with its violations thereof only with respect to John Doe as the male accused of sexual assault, demonstrates Defendant Columbia's deceptive practices with respect to males accused of sexual assault at Columbia University.

165.   Based on the foregoing facts and circumstances, Defendant Columbia engaged in unfair or deceptive trade practices in violation of Section 349(a) of the General Business Law.

166.   As a result of Defendant Columbia's deceptive acts and practices, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

167.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SIXTH CAUSE OF ACTION
### Estoppel and Reliance

168.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

169.   Defendant Columbia's various policies constitute representations and promises that Defendant Columbia should have reasonably expected to induce action or forbearance by John Doe.

170.   Defendant Columbia expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Defendant Columbia would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of Columbia Universities Gender-Based Misconduct Policies.

171.   John Doe relied to his detriment on these express and implied promises and representations made by Defendant Columbia.

172.   Based on the foregoing, Defendant Columbia is liable to John Doe based on Estoppel.

60

173.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

174.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

175.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

176.   Based on the foregoing facts and circumstances, Defendant Columbia intentionally and/or with willful or wanton indifference to the truth, engaged in conduct to suspend John Doe from Columbia University without regard to the truth of the allegations being made by Jane Doe and without evidence in support of Jane Doe's belated claims, and otherwise intentionally inflicted emotional distress upon John Doe.

177.   The above actions and inactions by Defendant Columbia were so outrageous and utterly intolerable that they caused mental anguish and severe

61

psychological and emotional distress to John Doe, as well as physical harm, financial loss, humiliation, loss of reputation and other damages.

178.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

179.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### Negligence

180.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

181.   Defendant Columbia owed duties of care to John Doe.   Such duties included, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of rape and sexual misconduct against him.

182.   Defendant Columbia breached its duties owed to John Doe.

183.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress,

62

psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

184.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE NINTH CAUSE OF ACTION
### Declaratory Judgment

185.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

186.   Defendant Columbia has committed numerous violations of the Parties' contracts and of federal and state law.

187.   John Doe's education and future career has been severely damaged. Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to John Doe's educational career and future employment prospects, with no end in sight.

188.   As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of John Doe's formal student record at Columbia University.

189.   By reason of the foregoing, John Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by Columbia University

at John Doe's Hearing be reversed; (ii) John Doe's reputation be restored; (iii) John Doe's disciplinary record be expunged; (iv) the record of John Doe's expulsion from Columbia University be removed from his education file; (v) any record of John Doe's Hearing be permanently destroyed; and (vi) Columbia University's rules, regulations and guidelines are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Defendant Columbia as follows:

(i)  on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)  on the second cause of action for violation of OCR rules, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)  on the third cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic

opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)   on the fourth cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)   on the fifth cause of action under Section 349(a) of the General Business Law, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)   on the sixth cause of action for estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)   on the seventh cause of action for intentional infliction of emotional distress, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)   on the eighth cause of action for negligence, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ix)   on the ninth cause of action for a declaratory judgment pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) the outcome and findings made by Columbia University at John Doe's Hearing be reversed; (ii) John Doe's reputation be restored; (iii) John Doe's disciplinary record be expunged; (iv) the record of John Doe's expulsion from Columbia University be removed from his education file; (v) any record of John Doe's Hearing be permanently destroyed; and (vi) Columbia University's rules, regulations and guidelines are unconstitutional as applied; and

(x)   awarding John Doe such other and further relief as the Court deems just, equitable and proper.

**Dated: New York, New York**
**August 18, 2014**

**NESENOFF & MILTENBERG, LLP**

By:_____
**Andrew T. Miltenberg, Esq. (AM 7006)**
**Kimberly C. Lau, Esq. (KL 9374)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**klau@nmllplaw.com**

-and-

66

**David Aylor Law Offices**
**David Aylor, Esq.**
**24 Broad Street**
**Charleston, SC 29401**
**(843) 577-5530**
**David@davidaylor.com**
*(pro hac vice pending)*

-and-

**Schmutz & Schmutz**
**Stephen Schmutz, Esq.**
**24 Broad St**
**Charleston, SC 29401**
**(843) 577-5530**
**steve@schmutzlaw.com**
*(pro hac vice pending)*

***Attorneys for Plaintiff John Doe***

67

**JURY DEMAND**

John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated: New York, New York
August 18, 2014

NESENOFF & MILTENBERG, LLP

By:
Andrew T. Miltenberg, Esq. (AM 7006)
Kimberly C. Lau, Esq. (KL 9374)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
klau@nmllplaw.com

-and-

David Aylor Law Offices
David Aylor, Esq.
24 Broad Street
Charleston, SC 29401
(843) 577-5530
David@davidaylor.com
*(pro hac vice pending)*

-and-

Schmutz & Schmutz
Stephen Schmutz, Esq.
24 Broad St
Charleston, SC 29401
(843) 577-5530
steve@schmutzlaw.com
*(pro hac vice pending)*

*Attorneys for Plaintiff John Doe*