UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                   :

JOHN DOE,                            :

                          :

                   Plaintiff,        :          14-CV-3573 (JMF)

                          :

           -v-                   :          OPINION AND ORDER

                          :

COLUMBIA UNIVERSITY, et al.,      :

                          :

                 Defendants.     :

                          :

--------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This case touches on issues that have been the subject of increasing public attention and

controversy: how colleges and universities address allegations of sexual assault on campus.

Plaintiff is a male college student who was suspended from Columbia University after having

been found to have engaged in non-consensual sex with a female classmate.[1]  As part of what

appears to be a growing phenomenon, he brings suit against the school and its Board of Trustees

(together, "Columbia"), alleging that the disciplinary process and his resulting suspension

violated federal and state law.  Most prominently, he alleges that Columbia's treatment of him

violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1961 *et seq.* ("Title IX"),

which makes it unlawful for a school receiving federal funds, such as Columbia, to discriminate

"on the basis of sex."  20 U.S.C. § 1681.  The gravamen of Plaintiff's Title IX claim is that, in

part because of backlash Columbia confronted because its treatment of men accused of sexual

---

[1]     Plaintiff originally filed this lawsuit under seal on May 19, 2014.  (Docket No. 1).  After
the Court ordered that the case be unsealed (Docket No. 3), Columbia consented to Plaintiff's
request to proceed pseudonymously in light of the "sensitive subject matter and the age of the
students involved" (Docket No. 19).

assault was perceived by some to be too lenient, Plaintiff was treated unfairly — and more harshly — on the basis of his sex.  (Am. Compl. (Docket No. 33) ¶¶ 4, 68-78, 139-40).

Columbia now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Amended Complaint (the "Complaint") for failure to state a claim. Significantly, Columbia's motion does not call upon the Court to wade into the larger public debates about how colleges and universities adjudicate (and, indeed, whether they even should adjudicate) allegations of sexual misconduct on campus.  Nor is it the Court's task to revisit Columbia's adjudication by weighing Plaintiff's account of what happened against the account of his accuser; in fact, the Court is required at this stage in the litigation to assume the truth of the factual assertions that Plaintiff makes in the Complaint.  Instead, the Court's narrow task is to decide whether the non-conclusory allegations in the Complaint are sufficient to plausibly infer that Columbia's treatment of Plaintiff was motivated in part by his sex.  Applying well-established precedent of the Supreme Court and Second Circuit, the Court concludes that the non-conclusory allegations in the Complaint are insufficient.  Specifically, ignoring the Complaint's conclusory (and sometimes overwrought) assertions of "anti-male bias" — as the Court must — there are no factual allegations in the Complaint that plausibly suggest Columbia acted because of, rather than in spite of, Plaintiff's sex.  Plaintiff's subjective belief that he was the victim of sex discrimination, even if firmly held, does not suffice.  The same is true of the fact that Columbia's policies with respect to gender-based misconduct complaints may well disproportionately affect male students.  Accordingly, and for the reasons stated below, Columbia's motion is granted, and the Complaint is dismissed in its entirety.

## BACKGROUND

Addressing allegations of sexual assault (on campus and elsewhere) can be complicated because the facts are often hotly disputed and come down to a contest of credibility between the accuser and accused.  That may well have been the case here, but — as noted above — in considering Columbia's motion to dismiss, the Court is required to treat the facts alleged in Plaintiff's Complaint as true and draw all reasonable inferences in his favor.  Thus, the following facts — taken from the Complaint and documents incorporated by reference therein — are assumed to be true.  *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 135 (2d Cir. 2001).

### A.  Columbia's Gender-Based Misconduct Policies

At all times relevant to this case, Columbia had in place formal policies — copies of which were provided to Plaintiff upon his acceptance to the school — defining "Gender-Based Misconduct" and setting forth procedures for handling complaints of such misconduct.  (Am. Compl. ¶ 19).[2]  Among other things, those policies (the "GBMPS") enumerated six types of prohibited sex-based conduct, including "non-consensual sexual intercourse."  (Decl. Alan E. Schoenfeld Supp. Defs.' Mot. To Dismiss Pl.'s Am. Compl. (Docket No. 36) ("Schoenfeld Decl."), Ex. B ("GBMPS") at 3).  In discussing "non-consensual sexual intercourse," the GBMPS provided that "[c]onsent cannot be procured by the use of physical force, compelling threats, intimidating behavior, or coercion" and that "[i]gnoring the objections of another person or pressuring them is a form of coercion."  (*Id.* at 4).  Among the examples of "gender-based misconduct," the GBMPS included "[p]ressure for a date or a romantic or intimate relationship" and "[p]ressure for or forced sexual activity."  (*Id.* at 2).

---

[2]      On August 15, 2014, Columbia made significant changes to its gender-based misconduct policies and practices.  (Am. Compl. ¶ 134).  As those changes post-dated the events at issue here, they are irrelevant for purposes of this case.

The GBMPS in effect at the time of the events in this case provided that, once Columbia received a complaint of gender-based misconduct, the student against whom the complaint was made (the "respondent") would be given notice of the complaint and an opportunity to meet with the Assistant Director for Student Services for Gender-Based and Sexual Misconduct to review the GBMPS. (*Id.* at 11-12). A staff member designated by the Assistant Director would then be tasked with conducting an investigation of the incident and drafting a report based on his or her findings. (*Id.* at 12). If Columbia determined at that stage that there was "reasonable cause" to believe that a policy violation had occurred, both the student making the complaint (the "complainant") and the respondent were to be given a chance to review the investigative report. (GBMPS at 13). If the respondent did not "accept responsibility" for the incident, the school would then convene a hearing panel — typically comprised of two deans or senior-level administrators and one student chosen from a specially trained pool of panelists (any of whose participation could be challenged by the complainant or the respondent on the ground of a perceived conflict of interest). (*Id.* at 12-14). Throughout the investigation and hearing process, both the complainant and the respondent were entitled to have a "supporter" present, but supporters were expressly prohibited from, "in any way, interven[ing] in the meeting/hearing or address[ing] the investigator/hearing panel." (*Id.* at 12-13; *see* Am. Compl. ¶ 22).

Before a hearing, the three-member hearing panel was charged with reviewing the investigative report and any other documentation. (GBMPS at 14). Under the GBMPS, both the complainant and the respondent had an opportunity to give a statement at the hearing and to answer questions posed by the panel. (*Id.*). The panelists were to determine, based on their review of the relevant testimony and documents, which other witnesses (if any) should testify and, while either the complainant or respondent could suggest questions to ask of the other party

or of a witness, the panel ultimately had discretion over the questions it elected to pose.  (*Id.* at

15).  If two out of three panel members determined by a preponderance of the evidence that the

respondent had committed a policy violation, the case was referred to the Dean of Students, who

determined the appropriate sanctions.  (*Id.*).  Both the complainant and the respondent could then

appeal the panel's findings or the sanctions imposed.  (*Id.* at 16; *see* Am. Compl. ¶ 21).

**B.  Plaintiff's Allegations**

    **1.  The Sexual Encounter Between Plaintiff and Jane Doe**

       Plaintiff in this case is a Florida native who, after excelling in high school, was admitted

into Columbia's class of 2016.  (Am. Compl. ¶¶ 16-17).  Shortly after arriving on Columbia's

campus in August 2012, Plaintiff became acquainted with a female first-year student ("Jane

Doe"), who was assigned to the same residence hall floor as Plaintiff.  (*Id.* ¶¶ 26-27).  During the

first semester of their first year, Jane Doe dated Plaintiff's roommate, and Plaintiff also became

close to Jane Doe's roommate.  (*Id.* ¶ 27).  By virtue of their shared social circle, Plaintiff and

Jane Doe saw each other "nearly on a daily basis" and often spent time together at social outings

on the weekends.  (*Id.* ¶ 28).

       On the night of May 12, 2013, Plaintiff was studying for his statistics final in a lounge on

the seventh floor of his residence hall.  (*Id.* ¶ 29).  At approximately 1:00 a.m. (*i.e.*, technically

on May 13, 2013), Jane Doe arrived outside the lounge and began speaking with one of

Plaintiff's and Jane Doe's mutual friends.  (*Id.* ¶¶ 29-30).  Ten or twenty minutes later, Jane Doe

came into the lounge and sat down next to Plaintiff.  (*Id.* ¶ 31).  They then talked until

approximately 2:30 a.m., when Plaintiff suggested that they go for a walk outside; Jane Doe

agreed.  (*Id.* ¶¶ 31-32).  Plaintiff and Jane Doe strolled around the Columbia University

neighborhood for approximately one hour, at which point they returned to the lounge where

Plaintiff had been studying. (*Id.* ¶¶ 32-33). As Plaintiff gathered his books, Jane Doe and Plaintiff began to flirt with each other, and they discussed "hooking up" instead of going to bed. (*Id.* ¶ 33). Because each of their roommates was asleep at the time — and Plaintiff's roommate was Jane Doe's ex-boyfriend — Jane Doe suggested that they go to the bathroom located within her suite rather than to either of their bedrooms. (*Id.* ¶ 34).

Plaintiff dropped his bag off in his room, and then the two walked together to Jane Doe's suite. (*Id.* ¶ 35). When they reached the bathroom located within Jane Doe's suite, Jane Doe instructed Plaintiff to wait there while she went into her bedroom to find a condom. (*Id.* ¶ 35). When Jane Doe came back into the bathroom, she undressed herself in front of Plaintiff, and the two proceeded to have sex. (*Id.*). Afterwards, Jane Doe took a shower, and Plaintiff returned to his room to go to sleep. (*Id.* ¶ 36).

In the following weeks, Jane Doe contacted Plaintiff a few times to express concern about how their sexual encounter might appear to others in their social circle, particularly because Jane Doe had dated Plaintiff's roommate. (*Id.* ¶¶ 37-38). At or about the same time, Jane Doe also spoke about the encounter to Claire Kao, a resident adviser to both her and Plaintiff, who then approached Plaintiff to discuss the evening. Kao told Plaintiff that she had been advised that he had engaged in "consensual sexual intercourse" with Jane Doe on the night of May 12th, and that Jane Doe had sought to discuss the encounter with her in confidence, but that she was required by state law to report the incident to Columbia. (*Id.* ¶ 39).[3] Despite Kao's statement, no formal report of the incident was filed at that time, and both Plaintiff and Jane Doe left for summer break later in May 2013. (*Id.* ¶¶ 40-41).

---

[3]     The Complaint does not explain why, if Kao had been told that the encounter was "consensual," she would nonetheless have been required to report it to the school.

### 2.  Jane Doe's Complaint Against Plaintiff and Columbia's Investigation

Plaintiff and Jane Doe returned to campus in the fall of 2013 to begin their sophomore years.  On September 24, 2013, Rosalie Siler, Columbia's then-Assistant Director for Gender-Based and Sexual Misconduct, informed Plaintiff that a fellow student (namely, Jane Doe) had filed a sexual assault complaint against him for an incident that had occurred on May 12, 2013. (*Id*. ¶ 42).  The next day, Siler met with Plaintiff, and gave him a formal notice that he was being charged with having engaged in "Non-Consensual Sexual Intercourse," in violation of the GBMPS.  (*Id*. ¶ 43).  Siler also told Plaintiff that the school had issued a "no contact" order barring him from any contact with Jane Doe.  (*Id.*).

That same day, Plaintiff met with Columbia's Title IX investigator, Jilleian Sessions-Stackhouse, to provide his account of what had happened on May 12th.  (*Id*. ¶ 47).  According to the Complaint, "Sessions-Stackhouse is not an independent fact finder or disinterested party with any specialized training; she is employed by Columbia University and her role is essentially one of prosecuting sexual assault on campus.  As such, [her] line of questioning was more akin to cross-examination calculated to illicit [sic] a confession" than it was "an objective attempt to factually reconstruct an event."  (*Id.* ¶ 48).  Moreover, Sessions-Stackhouse did not record the interview with Plaintiff, but took handwritten — and in Plaintiff's view, selective — notes.  (*Id.*). Pointedly, the Complaint charges that, "having worked for a women's resource center in the past, Ms. Sessions-Stackhouse does not come from a gender-neutral background."  (*Id.*).

In their first meeting, Plaintiff told Sessions-Stackhouse that there were several other students present in the lounge on the night of May 12th; Sessions-Stackhouse, however, did not ask Plaintiff any follow-up questions or engage in any further investigation as to who those students were.  (*Id*. ¶ 47).  Moreover, the Complaint charges that, at no point in the meeting or in

any follow-up meetings did Sessions-Stackhouse advise Plaintiff that he had a right under the GBMPS to submit a written statement to her or to the soon-to-be-convened hearing panel, or inform Plaintiff of his right to bring a silent advocate or "supporter" to any of the meetings during the investigation and disciplinary process. (*Id*. ¶¶ 51-52).

On October 21, 2013, Plaintiff met with Siler again in order to inform her that some of Jane Doe's friends had "harassed and assaulted [him] on campus," harassment that he contended was "on the basis of gender as a male accused of sexual assault." (*Id.* ¶ 54). According to Plaintiff, "Siler did not take [his] complaint of gender-based harassment seriously and quickly dismissed" it. (*Id.*).

The next day, October 22, 2013, Plaintiff spoke again with Sessions-Stackhouse and reviewed her notes from their September meeting. (*Id.* ¶ 55). Plaintiff observed that Sessions-Stackhouse had inaccurately paraphrased his account of the events of May 12th. (*Id.*). He attempted to correct Sessions-Stackhouse's notes, but she "did not leave [Plaintiff] with any other choice but to accept the account as written." (*Id.*). Plaintiff also advised Sessions-Stackhouse that another student and friend of Jane Doe's, India Knight, had information relevant to the investigation, but Sessions-Stackhouse had not known of her and did not interview Knight until Plaintiff mentioned her at this meeting. (*Id.*). After the meeting, Plaintiff sought out psychological counseling; the doctor he saw noted that Plaintiff possessed "near suicidal thoughts" due to the stress of Columbia's investigation and his perception that he had been wrongly accused. (*Id.* ¶ 58).

On January 25, 2014, Plaintiff met with Columbia's Deputy Title IX Coordinator, Virginia Ryan, in order to review Sessions-Stackhouse's completed investigative report. (*Id.* ¶¶ 60-61). Upon seeing the report, Plaintiff noted that it disregarded Plaintiff's statement that

Jane Doe had "clear[ly] expressed verbal consent" on the night of the incident, and that Sessions-Stackhouse had failed to investigate or reconcile the conflicting accounts of the evening given by Jane Doe and Knight.  (*Id*. ¶ 61).  The report also contained no mention of an interview with, or any statements from, Jane Doe's roommate or the two students with whom Jane Doe had chatted outside the lounge on the night of May 12th.  (*Id*. ¶ 63).  All in all, Plaintiff alleges that Sessions-Stackhouse "adopted Jane Doe's version" of the night in question, "to the exclusion of important details provided by [Plaintiff]."  (*Id*. ¶ 64).

### 3.   The Disciplinary Hearing and Plaintiff's Suspension

On February 12, 2014, at approximately 8 p.m., Plaintiff's disciplinary hearing began before three members of the Columbia community: two staff members and one graduate student. (*Id*. ¶¶ 79, 82).  This time, Plaintiff was accompanied by a "support person," his roommate at the time.  (*Id*. ¶ 80).  Jane Doe brought her own "support person": Sarah Weinstein, the membership director of the Columbia Democrats and a prominent critic of Columbia's handling of sexual assault complaints on campus.  (*Id*. ¶¶ 71-72, 80).  At the beginning of the hearing, Plaintiff was given an opportunity to make a statement; not having been advised about that part of the process, however, Plaintiff simply stated that he had "done nothing wrong."  (*Id*. ¶ 85).

Jane Doe and Plaintiff then both gave their accounts of what had happened on the night of May 12, 2013.  (*Id*. ¶ 86).  The panel also received Sessions-Stackhouse's investigative report, which was entered into evidence.  (*Id*. ¶ 89).  No witnesses appeared at the hearing to support Plaintiff's defense, which Plaintiff attributes to the failure of Sessions-Stackhouse to adequately investigate the incident and discover such witnesses.  (*Id*. ¶¶ 90, 92).  Further, although witnesses were entitled to submit written statements during the process, none did on Plaintiff's behalf, as

Columbia failed to "obtain or afford" Plaintiff "the right to submit witness statements." (*Id.* ¶ 92). All told, the hearing lasted less than two hours. (*Id.* ¶ 95).

On February 18, 2014, Ryan gave Plaintiff formal notice of the hearing's results. (*Id.* ¶ 96). The hearing panel concluded that Plaintiff had engaged in non-consensual sexual intercourse with Jane Doe. (*Id.*). Significantly, the panel found, in particular, "that it is more likely than not that [Plaintiff] directed unreasonable pressure for sexual activity toward [Jane Doe] over a period of weeks," and that this constituted coercion within the definition of "non-consensual sexual intercourse" in the GBMPS. (*Id.*; *see also* GBMPS at 2). On February 26, 2014, the Dean of Student Affairs, Terry Martinez, sanctioned Plaintiff by suspending him until the fall of 2015; additionally, Columbia did not credit Plaintiff for his class attendance in the spring of 2014 up until the time of his suspension. (Am. Compl. ¶ 99). Plaintiff was advised of his right to appeal Dean Martinez's sanction and the disciplinary panel's underlying decision within five days. (*Id.* ¶ 102).

On March 3, 2014, Plaintiff did appeal to the Dean of the College, James Valentini. (*Id.* ¶ 104). Plaintiff argued that Columbia had committed procedural errors, and submitted emails and interviews with student witnesses that had not been included in Sessions-Stackhouse's investigative report or mentioned at the hearing. (*Id.*). Plaintiff also contended that Columbia had "facilitated a breach of confidentiality," citing the fact that the results of Plaintiff's disciplinary hearing had been revealed to an editor at a Columbia student-run newspaper, *The Blue and the White*. (*Id.* ¶¶ 103-04). Notably, Jane Doe herself also appealed to Dean Valentini to reduce the severity of the sanction. (*Id.* ¶ 105).

One week later, Dean Valentini denied Plaintiff's appeal, finding, among other things, that Sessions-Stackhouse had discretion about whom to interview; that Plaintiff had failed to

identify his witnesses until the appeal; and that those witnesses would not necessarily have exonerated Plaintiff in any event, as the coercive behavior for which he was found responsible had been committed over the course of the weeks leading up to May 12th, outside the presence of the witnesses.  (*Id.* ¶ 106; *see* Mem. Law Supp. Defs.' Mot. To Dismiss Pl.'s Am. Compl. Pursuant R. 12(b)(6) (Docket No. 35) ("Defs.' Mem.")).  Dean Valentini further found that the length of Plaintiff's suspension was appropriate.  (Am. Compl. ¶¶ 106, 108).  As a result, Plaintiff remains suspended until this upcoming fall, which he alleges has "ruined" his academic career and caused other forms of damage.  (*Id.* ¶¶ 110-13).

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). Significantly, however, the Supreme Court has made clear that a court should not accept *non*-factual matter or "conclusory statements" set forth in a complaint as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009).  Instead, a court must follow a two-step approach in assessing the sufficiency of a complaint in the face of a Rule 12(b)(6) motion.  *See id.* at 680-81.  First, the court must distinguish between facts, on the one hand, and "mere conclusory statements" or legal conclusions on the other hand; the latter are not entitled to the presumption of truth and must be disregarded.  *Id.* at 678-79.  Second, the court must "consider the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief."  *Id.* at 681.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2008)).  A plaintiff must show "more than a sheer

possibility that a defendant acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Id.* at 570.

　　As discussed below, courts have interpreted Title IX by looking to case law interpreting other discrimination statutes, including Title VII of the Civil Rights Act of 1964.  *See, e.g.*, *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  *Twombly* and *Iqbal* notwithstanding, the Supreme Court has held in the Title VII context that, to survive a motion to dismiss, a complaint "need not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Twombly*, 550 U.S. at 569 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)).  The Second Circuit recently clarified that that holding remains good law, but only "as modified by *Twombly* and *Iqbal*."  *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014).  Thus, although a plaintiff "need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss," the complaint "must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible."  *Id. at* 254.  In applying *Twombly* and *Iqbal* to employment discrimination claims, courts in this Circuit have further held that the elements of a *prima facie* case "provide an outline of what is necessary to render [a plaintiff's discrimination] claims for relief plausible." *Sommersett v. City of N.Y.*, No. 09-CV-5916 (LTS) (KNF), 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011).  Thus, a court must dismiss a Title VII claim — and presumably, by extension, a Title IX claim — if the plaintiff "fail[s] to allege even the basic elements of a discriminatory action claim."  *Patane v. Clark*, 508 F.3d 106, 112 n.3 (2d Cir. 2007).  Further, "[n]aked

assertions of . . . discrimination without any specific factual allegation of a causal link between the defendants' conduct and the plaintiff's protected characteristic are too conclusory to withstand a motion to dismiss." *Sanders-Peay v. NYC Dep't of Educ.*, No. 14-CV-4534 (CBA) (MDG), 2014 WL 6473507, at *3 (E.D.N.Y. Nov. 18, 2014) (internal quotation marks omitted).

## PLAINTIFF'S TITLE IX CLAIM

With that guidance in mind, the Court turns to the only federal claim that Plaintiff is pursuing: his claim of discrimination in violation of Title IX.[4]  Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  It is well established that a school's failure to prevent or remedy sexual harassment of a student, including sexual assault, may violate Title IX.  *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999); *Bliss v. Putnam Valley Cent. Sch. Dist.*, No. 06-CV-15509 (WWE), 2011 WL 1079944, at *4 (S.D.N.Y. Mar. 24, 2011).  At the same time, it is equally well established "that Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf*, 35 F.3d at 715.  In either case, the statute "is enforceable through an implied private right of

---

[4]     The Complaint also includes a claim based on Columbia's alleged violation of "rules" relating to Title IX promulgated by the United States Department of Education's Office of Civil Rights.  (Am. Compl. ¶¶ 138-157).  But Plaintiff failed to respond to Columbia's motion to dismiss that claim, so the claim is deemed abandoned and dismissed on that basis.  *See Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted)); *cf. Jackson v. Federal Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to a motion for summary judgment] that relevant claims or defenses that are not defended have been abandoned.").

action for monetary damages as well as injunctive relief." *Id.* at 714 (citation omitted); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998).

Because "Title IX was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities . . . [and] because Title IX mirrors the substantive provisions of Title VI of the Civil Rights Act of 1964 . . . courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII." *Yusuf*, 35 F.3d at 714; *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011). There is, however, one significant difference for present purposes between Title VII, on the one hand, and Titles VI and IX, on the other: While a Title VII claim may be premised on the "disparate impact" a policy has with respect to a protected group, *see, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009), courts have held that disparate-impact claims may not be brought under Titles VI and IX, *see, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (noting that Title VI "prohibits only intentional discrimination" and that Title IX "was patterned after Title VI" (internal quotation marks omitted)); *Yu v. Vassar Coll.*, No. 13-CV-4373 (RA), 2015 WL 1499408, at *10 & n.6 (S.D.N.Y. Mar. 31, 2015) (interpreting *Sandoval* and other precedent to mean there is no private right of action for disparate impact under Title IX and citing cases); *Weser v. Glen*, 190 F. Supp. 2d 384, 395 (E.D.N.Y 2002) ("Because Title IX is derived from Title VI, *Alexander v. Sandoval* implies that no such private right of action [to enforce regulations prohibiting disparate impact discrimination] exists under Title IX as well."), *aff'd*, 41 F. App'x 521 (2d Cir. 2002) (summary order). Thus, in order to establish a claim of discrimination under Title IX, a plaintiff must ultimately show that the defendant discriminated against him or her *because of sex*; that the discrimination was intentional; and that the discrimination was a "substantial" or "motivating

14

factor" for the defendant's actions. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001). It is not enough to show that a policy or practice disproportionately affects one sex.

In *Yusuf*, the Second Circuit explained that cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories." *Yusuf*, 35 F.3d at 715. In the first category, "erroneous outcome" cases, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Id.* In the second, "selective enforcement" cases, the "claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* For either kind of claim, the plaintiff must plead and prove that "the complained-of conduct was discriminatory." *Id.* In an "erroneous outcome" case, therefore, it is necessary, but not sufficient, to allege "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* The plaintiff must "*also* allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* (emphasis added). As the *Yusuf* Court explained, "[s]uch allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

Regardless of the type of claim asserted by a plaintiff, "wholly conclusory allegations," as noted above, are not enough to survive a motion to dismiss. *Id.* It follows that "allegations of a procedurally or otherwise flawed proceeding that has led to an . . . erroneous outcome combined with a conclusory allegation of gender discrimination" will not withstand scrutiny at this stage of the litigation. *Id.*; *see also id.* (noting that allegations in support of a Title IX claim must "do more than merely recite the pleader's conclusion that the complained-of conduct was discriminatory"); *Sanders-Peay*, 2014 WL 6473507, at *3 ("Naked assertions of . . .

discrimination without any specific factual allegation of a causal link between the defendants'
conduct and the plaintiff's protected characteristic are too conclusory to withstand a motion to
dismiss." (internal quotation marks omitted)).  Instead, "[a] plaintiff must thus also allege
particular circumstances suggesting that gender bias was a motivating factor behind the
erroneous finding." *Yusuf*, 35 F.3d at 715; *see also Manolov v. Borough of Manhattan Cmty.
Coll.*, 952 F. Supp. 2d 522, 532 (S.D.N.Y. 2013) (holding that, in bringing claims of
discrimination against a university, "[b]ald assertions and conclusions of law will not suffice"
(internal quotation marks omitted)).

  In this case, Plaintiff brings both an "erroneous outcome" claim and a "selective
enforcement" claim.  *See Yusuf*, 35 F.3d at 715 (noting that "Plaintiffs may plead in the
alternative that they are in both categories").[5]  Before turning to his claims, however, the Court

---

[5]  Liberally construed, the Complaint could also be read to bring more generic due process
and equal protection claims.  (*See, e.g.*, Am. Compl. ¶¶ 4, 126).  To the extent it does, the claims
fail, as such constitutional claims may be brought only against "state actors."  *See Giano v.
Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (equal protection); *United States v. Int'l Bhd. of
Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 954 F.2d 801, 806 (2d Cir.
1992) (due process).  Columbia is indisputably a private university, and nowhere does Plaintiff
allege that Columbia was a "state actor" when it engaged in the challenged conduct.  *See Yu,*
2015 WL 1499408, at *11 ("Since [Defendant] is a private college, and not a state actor, the
federal Constitution does not establish the level of due process that [Defendant] had to give
[Plaintiff] in his disciplinary proceeding." (internal quotation marks omitted)).  Plaintiff appears
to allege also that Columbia violated his right to *statutory* due process — namely, the process
due to him under Title IX and related regulations and guidance.  (*See* Am. Compl. ¶¶ 122-24).
To the extent he does, the Court need not address the claim separately, as "a plaintiff does not
state a cause of action under Title IX by alleging a procedural infirmity, absent a particularized
allegation of a causal connection between gender discrimination and the wrongful outcome of
the flawed proceeding."  *Vega v. State Univ. of N.Y. Bd. of Trustees*, No. 97-CV-5767 (DLC),
2000 WL 381430, at *4 (S.D.N.Y. Apr. 13, 2000) (citing *Yusuf*)).  In other words, even if
Plaintiff alleged that the disciplinary proceeding was procedurally flawed and led to an erroneous
outcome — whether based on a failure to comply with Title IX regulations or otherwise — he
would still have to plausibly allege that the outcome was motivated by his sex.  *See, e.g., Scott v.
WorldStarHipHop, Inc.*, No. 10-CV-9538 (PKC) (RLE), 2011 WL 5082410, at *5 (S.D.N.Y.
Oct. 25, 2011), *aff'd sub. nom. Scott v. Berkeley Coll.*, — F. App'x —, 2015 WL 1428226 (2d
Cir. Mar. 31, 2015) (summary order).  As discussed below, he fails to do so.

observes that Plaintiff's Complaint is rife with "bald assertions and conclusions of law," *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz*, 534 U.S. 506, which are not entitled to the presumption of truth, *see id.*; *see also Iqbal*, 556 U.S. at 678. For example, Plaintiff alleges — without any factual support — that Sessions-Stackhouse overlooked witnesses favorable to him "to protect a false, anti-male biased narrative." (Am. Compl. ¶ 50). Similarly, Plaintiff asserts — again without any factual support — that males at Columbia accused of sexual misconduct "are invariably found guilty, regardless of the evidence, or lack thereof." (*Id.* ¶ 139). In the wake of *Iqbal* and *Twombly*, however, the Court may not accept such conclusory assertions and legal conclusions as true. *See, e.g.*, *Abraham v. Am. Home Mortgage Servicing, Inc.*, 947 F. Supp. 2d 222, 230 (E.D.N.Y. 2013) ("Although this Court must accept the factual allegations set forth in Plaintiffs' complaint as true, threadbare recitals and conclusory statements unsupported by specific facts are not entitled to such credence." (internal quotation marks omitted)); *Pungitore v. Barbera*, No. 11-CV-6249 (VB), 2012 WL 2866293, at *4 (S.D.N.Y. Mar. 29, 2012) (declining to "assume" the "veracity" of "legal conclusions"), *aff'd*, 506 F. App'x 40 (2d Cir. 2012) (summary order). As it happens, Plaintiff's assertion that men at Columbia accused of sexual misconduct "are invariably found guilty" also conflicts with allegations elsewhere in the Complaint that Columbia has been subject to "great criticism" and "negative public scrutiny" because the school is "not being firm enough" in its treatment of sexual assault. (Am. Compl. ¶¶ 68, 139-40). Where a plaintiff's "own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." *Nationwide Mut. Ins. Co. v. Morning Sun Bus. Co.*, No. 10-CV-1777 (ADS) (AKT), 2011 WL 381612, at *6 (E.D.N.Y. Feb. 2, 2011). Accordingly, that is an independent basis to ignore the allegation.

## A.  The Erroneous Outcome Claim

Applying the foregoing principles, the Court concludes first that Plaintiff's non-conclusory factual allegations do not move his erroneous outcome claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  Plaintiff alleges, *inter alia*, that Sessions-Stackhouse's investigation was rife with procedural errors, including her failure to investigate the identities of potential witnesses (Am. Compl. ¶ 47); her failure to reconcile conflicting narratives of what happened on the evening of May 12th in her investigative report (*id.* ¶ 61); and her failure to advise Plaintiff of his rights during the investigative process, including the right to submit his own written statement to her and to the soon-to-be-convened hearing panel and his right to a silent advocate or "supporter" during the investigation and disciplinary process (*id.* ¶¶ 51-52).  And Plaintiff cites, as evidence of sex discrimination, ways in which he and Jane Doe were treated differently during the investigative process and hearing.  He asserts, for example, that Sessions-Stackhouse treated Jane Doe "with more sensitivity" during the investigation (*id.* ¶ 53); that she employed a line of questioning akin to "cross-examination" in interviewing him but did not do so in interviewing Jane Doe (*id.* ¶¶ 48-49); that Jane Doe "received thorough advisements of the resources available to her during the conduct process," while he was not informed of his rights and the resources available to him (*id.* ¶¶ 51-53); and that, during the hearing, the panelists "freely allowed Jane Doe to escape critical questioning by crying on the witness stand" (*id.* ¶ 130).

As a threshold matter, it is not clear that Plaintiff's allegations plausibly "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding."  *Yusuf*, 35 F.3d at 715.  That is for at least two reasons.  First, the vast majority of Plaintiff's allegations concern the conduct and alleged bias of Sessions-Stackhouse.  But Sessions-Stackhouse was merely the

Title IX investigator — whose role, according to the Complaint, was "essentially one of prosecuting sexual assault on campus" (Am. Compl. ¶ 48) — not the ultimate (and allegedly neutral) arbiter of Jane Doe's sexual assault complaint.  *See Yu*, 2015 WL 1499408, at *14 (noting, in addressing allegations with respect to the conduct of the defendant's Title IX investigator, that he "had no decision making role in the outcome of the hearing, and there is no reason to believe that the panel members could have confused [his] testimony to be anything other than the statements of the investigator — they were presented, after all, with his Investigator Report as part of the hearing file — rather than as a percipient witness with personal knowledge of the events").  Second, Plaintiff's allegations concerning the adequacy of Columbia's investigation of the events of May 12, 2013, are arguably irrelevant to the outcome of the hearing, as the panel's ruling that Plaintiff had engaged in non-consensual sex with Jane Doe did not turn on the events of that night.  Instead, the panel's conclusion rested on its finding that "it [was] more likely than not that [Plaintiff] directed unreasonable pressure for sexual activity towards the Complainant *over a period of weeks*," and that "this pressure constituted coercion."  (Am. Compl. ¶ 96 (emphasis added)).[6]  Thus, as Dean Valentini effectively found in affirming the panel's finding (*id.* ¶ 106), any error in not developing the record with respect to what happened on the night of May 12th was arguably harmless as it is not likely to have altered the outcome of the hearing.

In any event, even assuming *arguendo* that the Complaint satisfies the "articulable doubt" prong of the *Yusuf* test, it still has one "fatal gap": the lack of any non-conclusory factual allegations giving rise to a plausible inference that the erroneous outcome was motivated by

---

[6]     Whether Columbia's definition of "non-consensual sex" is unduly broad may well be the subject of legitimate debate, but it is irrelevant to Plaintiff's claims in this case and thus well beyond the scope of this Opinion.

Plaintiff's sex. *Yusuf*, 35 F.3d at 715. The Complaint includes no allegations of the sort that the

Second Circuit identified in *Yusuf* as sufficient to suggest that gender bias was a motivating

factor for an erroneous disciplinary decision — namely, "statements by members of the

disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making

that also tend to show the influence of gender." *Id.* Instead, as noted above, the Complaint

repeatedly makes conclusory assertions — most offered "[u]pon information and belief" — that

the actions of Sessions-Stackhouse in particular, and Columbia more generally, "were based on

an anti-male gender bias." (Am. Compl. ¶ 64; *see also id.* ¶¶ 49-50, 53, 56, 97; Mem. Law

Opp'n Defs.' Mot. To Dismiss (Docket No. 39) ("Pl.'s Mem.") 18 (declaring it "self-evident"

that Sessions-Stackhouse's actions "reflected an anti-male gender bias")).

       Under *Iqbal* and *Twombly*, however, the Court must ignore those conclusory statements.

*See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; *see also, e.g.*, *Pungitore v. Barbera*, 506

F. App'x 40, 42 (2d Cir. 2012) (summary order) (stating that a court "must . . . ignore mere

conclusory statements or legal conclusions, which are not entitled to the presumption of truth"

(internal quotation marks omitted)). That Plaintiff couches most of them as made "[u]pon

information and belief" merely underscores the glaring absence of particularized evidence

supporting an inference that gender bias was causally linked to a flawed outcome. *See also, e.g.*,

*Vista Food Exch., Inc. v. Champion Foodservice, L.L.C.*, No. 14-CV-804 (RWS), 2014 WL

3857053, at *9 (S.D.N.Y. Aug. 5, 2014) ("While a plaintiff may plead facts alleged upon

information and belief where the belief is based on factual information that makes the inference

of culpability plausible, such allegations must be accompanied by a statement of the facts upon

which the belief is founded." (internal quotation marks omitted)); *accord Munoz-Nagel v. Guess,*

*Inc.*, No. 12-CV-1312 (ER), 2013 WL 1809772, at *3, 7 (S.D.N.Y. Apr. 30, 2013). Put simply,

Plaintiff's subjective belief that he was the victim of discrimination — however strongly felt — is insufficient to satisfy his burden at the pleading stage. *See, e.g.*, *Dooley v. JetBlue Airways Corp.*, No. 14-CV-4432 (JMF), 2015 WL 1514955, at *3 (S.D.N.Y. Apr. 1, 2015) (holding that the plaintiff's "repeated assertions that [the defendant's] actions can only be the product of discrimination lack any factual support and, thus, do not constitute circumstances giving rise to a plausible inference of racially discriminatory intent" (internal quotation marks and citation omitted)); *Jones v. City of N.Y.*, No. 14-CV-0826 (CBA) (RLM), 2015 WL 502227, at *5 (E.D.N.Y. Feb. 5, 2015) (noting that while the plaintiff "may well have subjectively believed that defendants' comments about her weave were tied to her skin color, that is plainly insufficient" (citation omitted)); *Mohawk v. William Floyd Sch. Dist.*, 13-CV-2518 (JS) (GRB), 2014 WL 838162, at *3 (E.D.N.Y. Mar. 3, 2014) (dismissing a claim where the plaintiff "fail[ed] to allege any facts, besides his own subjective belief, that plausibly suggest that the altercations . . . were in any way connected to his  race, color, or national origin"); *Brodt v. City of N.Y.*, 4 F. Supp. 3d 562, 568 (S.D.N.Y. 2014) ("[A] plaintiff's feelings and perceptions of being discriminated against are not evidence of discrimination." (internal quotation marks omitted)).

The only arguably *factual* allegation that Plaintiff makes in support of his assertion that Sessions-Stackhouse was motivated by "an anti-male gender bias" is that she had "worked for a women's resource center in the past" and thus did "not come from a gender-neutral background." (Am. Compl. ¶ 48).  That *ad feminem* allegation, however, is plainly insufficient to show that Sessions-Stackhouse's actions — let alone Columbia's ultimate decisions — with respect to *Plaintiff* were motivated by gender bias.  And while Columbia may well have treated Jane Doe more favorably than Plaintiff during the disciplinary process, the mere fact that Plaintiff is male and Jane Doe is female does not suggest that the disparate treatment was *because of* Plaintiff's

sex.  Indeed, the alleged treatment "'could equally have been'" — and more plausibly was — "'prompted by lawful, independent goals,'" such as a desire (enhanced, perhaps, by the fear of negative publicity or Title IX liability to the victims of sexual assault) to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity.  *Twombly*, 550 U.S. at 567 (quoting *Kramer v. Pollock–Krasner Foundation*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995)).[7]  In other words, the disparate treatment of Plaintiff and Jane Doe "is merely consistent with the defendants' liability, and hardly establishes a plausible inference of discrimination." *Pungitore*, 506 F. App'x at 43 (citation omitted); *see Sanders v. Grenadier Realty, Inc.*, 367 F. App'x 173, 175 (2d Cir. 2010) (summary order) (upholding dismissal of plaintiffs' complaint because while it "does allege facts consistent with a discrimination claim, *i.e.*, that non-black residents were granted subsidies, it nevertheless 'stops short of the line between possibility and plausibility of entitlement to relief,' because plaintiffs do not allege any facts supporting an inference of racial animus." (citation omitted) (quoting *Iqbal*, 556 U.S. at 696)).

Notably, the Court's conclusion that Plaintiff's allegations fail as a matter of law is consistent with the decisions of other district courts in similar cases.  *See, e.g.*, *Brown v. Castleton State Coll.*, 663 F. Supp. 2d 392, 403-04 (D. Vt. 2009) (dismissing a Title IX claim); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 755-56 (E.D. Tenn. 2009) (same); *see also, e.g.*, *Yu*, 2015 WL 1499408, at *22-27 (granting summary judgment on the ground that the plaintiff

---

[7]      In fact, the Complaint alleges that the disciplinary process against Plaintiff took place during a time when Columbia was "under fire" for its handling of sexual assault complaints, culminating in the filing, by twenty-three students from Columbia and Barnard College, of complaints with the United States Department of Education (the "DOE") that Columbia's handling of sexual assault and sexual misconduct on campus violated Title IX and other laws. (Am. Compl. ¶¶ 68-78).  It may well be that a desire to avoid Title IX liability to the alleged victims of sexual assault or an effort to persuade the DOE and others that it takes sexual assault complaints seriously caused Columbia to "maladminister[]" Plaintiff's disciplinary hearing, as he alleges.  (*Id.* ¶ 78).  But that is not discrimination against Plaintiff because of sex.

had failed to establish that the outcome of his disciplinary proceedings was biased because of his gender); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 576-81 (E.D. Va. 1996) (same). In *Doe v. University of the South*, for example, the plaintiff alleged that procedural defects in disciplinary proceedings against him with respect to an alleged sexual assault, including an inadequate investigation and deficient notice of the charges — notice that was given only a day before the hearing — violated Title IX.  The Court dismissed his claim, however, finding that the complaint failed to plausibly allege "that the University's actions against [the plaintiff] were motivated by sexual bias or that . . . the University's disciplinary procedures governing sexual assault claims [are] 'discriminatorily applied or motivated by a chauvinistic view of the sexes.'" 687 F. Supp. 2d at 756 (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634, 640 (6th Cir. 2003) (unpublished decision)).  "'[O]ne case by an individual who was subjectively dissatisfied with a result,'" the Court reasoned, "'does not constitute a pattern of decision making'" giving rise to an inference of discriminatory intent."  *Id.* (quoting *Mallory*, 76 F. App'x at 640).

Similarly, in *Brown*, the plaintiff alleged that his former nursing program had, in connection with disciplinary proceedings against him, "ignored certain evidence and accepted other evidence unquestioningly."  663 F. Supp. 2d at 403.  The Court agreed that those allegations were sufficient "to cast doubt on the administrative tribunal's outcome," satisfying the first prong of the *Yusuf* test, but held that they fell short of plausibly suggesting discriminatory intent.  *Id.*  As the Court reasoned, there were "many possible explanations for [the school's conduct], among them time constraints, laziness, or just that it was standard procedure to do so."  *Id.*  And while the plaintiff also claimed "that '[t]he investigative report itself was biased,' and '[t]he investigative report is another instance of the discrimination against [him],'" the Court concluded that those were "naked assertions with no factual content," and thus

ignored them "per *Iqbal*."  *Id.* at 404; *see also Yu*, 2015 WL 1499408, at *27 (observing that the fact "[t]hat an alleged victim of sexual misconduct would receive help from a counselor cannot reasonably be seen as a marker of anti-male gender bias"); *Haley*, 948 F. Supp. at 578-79 (granting summary judgment on the ground that there was no "direct evidence of gender bias" and that the school's disparate treatment of the plaintiff and his accuser "at best reflect a bias against people accused of sexual harassment and in favor of victims and indicate nothing about gender discrimination").

The Second Circuit's decision in *Yusuf* does not call for a different result.  To be sure, the *Yusuf* Court held that the plaintiff's allegations were sufficient to state a claim under Title IX and relied in part on an allegation that is repeated nearly verbatim in the Complaint here (Am. Compl. ¶ 139): that males accused of sexual harassment at the school were "invariably found guilty, regardless of the evidence, or lack thereof."  35 F.3d at 716.  *Yusef,* however, was decided in 1994 — long before the Supreme Court's clarification of the pleading standards in *Twombly* and *Iqbal*.  In light of those decisions, and as the Court has already noted, the Court is no longer required to consider as true — and, in fact, for the purposes of evaluating the Complaint's sufficiency, is compelled to disregard — Plaintiff's allegation, as it is devoid of factual support or examples of *any* other males at Columbia who have been found guilty, let alone "regardless of the evidence."  *See Iqbal*, 556 U.S. at 680-81.[8]  Notably, the Second Circuit itself has modified

---

[8]      Although not necessary to its ultimate conclusion, the Court notes its skepticism of the *Yusuf* Court's reasoning that the plaintiff's allegation about males invariably losing provides a "verifiable causal connection" between Vassar's treatment of the plaintiff and his gender.  35 F.3d at 716.  Without more — for example, information concerning a control group or the like — alleging that all members of a particular group (of indeterminate size, no less) have been treated in a particular way does not say anything about the reasons for that treatment.  *Cf. Weinstock v. Columbia Univ.*, 224 F.3d 33, 46 (2d Cir. 2000) (rejecting the contention that "raw data purportedly describing a pattern of under-representation and unequal opportunity for women faculty at Columbia leads to the conclusion that gender discrimination is in play"); *Beshty v.*

its approach to allegations such as those in *Yusuf* since *Iqbal* and *Twombly*.  In a recent Title IX case in which a student charged that she was not placed in an accelerated math class because of her gender, for example, the Court of Appeals affirmed the district court's dismissal of the plaintiff's claims.  *Pungitore*, 506 F. App'x at 43.  The Court noted that the plaintiff had alleged that "'less qualified male students had been placed' in the double-accelerated math class," but found that, "given the lack of any alleged facts surrounding this conclusory assertion, [the Court] need not afford it the presumption of truth under *Iqbal* and *Twombly*."  *Id.* at 43 n.1.

Notably, Plaintiff relies on only one case other than *Yusuf* to support his contention that he adequately pleads intentional discrimination for purposes of his erroneous outcome claim: *Wells v. Xavier University*, 7 F. Supp. 3d 746 (S.D. Ohio 2014).  (Pl.'s Mem. 15; *see id.* at 12-21).  The Court, however, declines to follow the *Wells* decision.  Although the Court in that case accurately recited the pleading standards set forth in *Iqbal* and *Twombly*, *see* 7 F. Supp. 3d at 748-49, it does not appear to have applied those standards to the plaintiff's Title IX claim.  That is, it held that the plaintiff's allegations survived not because they gave rise to a plausible inference that an erroneous outcome of the disciplinary proceedings at issue was due to gender discrimination, but rather because the allegations "put[] Defendants on adequate notice that he contends they have had a pattern of decision-making that has ultimately resulted in an alleged false outcome that he was guilty of rape."  *Id.* at 751.  In doing so, the Court appears to have

---

*General Motors*, 327 F. Supp. 2d 209, 219-20 (W.D.N.Y. 2004) (concluding that evidence that, out of 175 people employed by the defendant over a seven-year period, sixty-eight were forty or older and eleven were fifty or older, was "meaningless" and "nothing more than raw data that provide no guidance whatsoever in determining whether [the defendant] discriminates against older employees"); *Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 224 (E.D.N.Y. 2002) ("Evidence that five out of thirty terminated employees were age-protected, without evidence of the total number of age-protected employees before and after the terminations and the percentage of discharged employees who were age-protected, is insufficient to establish age-discrimination.").

revived the more lenient pleading standard that was "retire[d]" in *Twombly*.  550 U.S. at 563.

Significantly, the *Wells* Court appears to have accepted as sufficient the mere fact that the

plaintiff "contend[ed]" that the defendant's actions "came against [him] . . . because he was a

male accused of sexual assault."  7 F. Supp. 3d at 751.  As discussed above, however, that sort of

subjective belief, devoid of factual support, is plainly insufficient after *Iqbal* and *Twombly*.

In short, because Plaintiff's non-conclusory factual allegations fail to give rise to a

plausible inference that the outcome of his disciplinary proceeding was motivated by gender,

Plaintiff's erroneous outcome claim must be and is dismissed.

## B.  Plaintiff's Selective Enforcement Claim

For similar reasons, Plaintiff's selective enforcement claim also fails.  As noted above, to

state such a claim, a plaintiff must plausibly allege that "regardless of the student's guilt or

innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected

by the student's gender."  *Yusuf*, 35 F.3d at 715.  Courts have interpreted that standard to require

a plaintiff to "allege particular circumstances suggesting a meaningful inconsistency in

punishment and particular circumstances suggesting that gender bias was a motivating factor

behind the inconsistency."  *WorldStarHipHop, Inc.*, 2011 WL 5082410, at *6; *see Harris v. Saint

Joseph's Univ.*, No. 13-CV-3937 (LFR), 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014).

And applying that requirement, courts have dismissed claims in the absence of allegations that a

school treated similarly situated members of the opposite sex — that is, members of the opposite

sex facing comparable disciplinary charges — differently.  *See, e.g.*, *Yusuf*, 35 F.3d at 716

(affirming dismissal of a Title IX selective enforcement claim where the plaintiff failed to allege

that any woman was treated differently and that the allegedly disparate treatment of another

accused student was based on similar disciplinary charges); *see also, e.g.*, *Routh v. Univ. of*

*Rochester*, 981 F. Supp. 2d 184, 211-12 (W.D.N.Y. 2013); *WorldStarHipHop*, 2011 WL

5082410, at *6; *Doe v. Univ. of the South*, 687 F. Supp. 2d at 756-57; *Curto v. Smith*, 248 F.

Supp. 2d 132, 146-47 (N.D.N.Y. 2003), *aff'd in part*, *appeal dismissed in part sub nom. Doe v.*

*Anonymous Unnamed Sch. Employees & Officials of Cornell Univ. Coll. of Veterinary Med.*, 87

F. App'x 788 (2d Cir. 2004), *and aff'd*, 93 F. App'x 332 (2d Cir. 2004) (summary order).

In this case, the Complaint not only fails to establish gender as a plausible motivating

factor behind the investigation and ultimate punishment, but it also fails to include any

allegations that female students "were treated more favorably in similar circumstances." *Curto*,

248 F. Supp. 2d at 147 (emphasis omitted).  At most, the Complaint identifies inadequate

procedural protections provided to students accused of sexual assault — and behavior by campus

officials towards such students more generally — that have the effect of burdening men more

than women, given "the higher incidence of female complainants of sexual misconduct [versus]

male complainants of sexual misconduct."  (Am. Compl. ¶ 138).  But, as the Court noted above

— and as Plaintiff himself effectively acknowledges (*see* Pl.'s Mem. 14-15) — Title IX does not

provide a private right of action to challenge disciplinary policies based on disparate impact.  *See*

*Weser*, 190 F. Supp. 2d at 395.  Instead, to state a selective enforcement claim under Title IX, a

plaintiff must allege facts sufficient to give rise to an inference that the school intentionally

discriminated against the plaintiff *because of* his or her sex — that the school acted "at least in

part 'because of,' not merely 'in spite of,' its adverse effects upon [the protected] group."  *Pers.*

*Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see also, e.g.*, *Johnson v. W. State Colo.*

*Univ.*, No. 13-CV-2747 (WJM) (KMT), 2014 WL 5423175, at *4 (D. Colo. Oct. 24, 2014)

("Plaintiff argues that he has stated a claim under the erroneous outcome standard and the

selective enforcement standard . . .  [B]oth require that a Plaintiff show that gender bias was a

source of the deprivation."). Having failed to do so, Plaintiff's Title IX selective enforcement

claim must also be and is dismissed. *See, e.g.*, *Curto*, 248 F. Supp. 2d at 147; *see also, e.g.*,

*Routh*, 981 F. Supp. 2d at 211-12 (dismissing the plaintiff's claim because his complaint "does

not plausibly plead facts suggesting that the University ever received a complaint against a

female student comparable to that filed against [the plaintiff] . . . and treated the female student

more favorably."); *WorldStarHipHop*, 2011 WL 5082410, at *6 (dismissing the plaintiff's claim

because the complaint failed to allege that the plaintiff was similarly situated to the two other

students receiving more lenient treatment).

      In so holding, the Court does not mean to suggest that, in order to survive a motion to

dismiss, a male plaintiff in Plaintiff's position must *necessarily* be able to allege that a female

student charged with sexual assault was treated differently. Given the allegedly higher incidence

of male-on-female sexual assaults (and sexual assault complaints) on campus (*see* Am. Compl.

¶ 138), that could pose an impossible pleading burden in some cases.[9] But a plaintiff must allege

something more than what Plaintiff alleges here — by, for example, including "comparisons to

accounts of other accused students"; "allegations that similarly situated women are or even men

would be treated differently"; or, at a minimum, "data showing that women rarely, if ever, are

accused of sexual harassment, coupled perhaps with evidence that women accused of other

---

[9]      Of course, there is nothing inherently gendered about sexual misconduct or sexual
misconduct complaints. That is, universities presumably receive at least some complaints of
sexual misconduct from men against men, women against women, or women against men (if not
complaints involving students who self-identify with neither gender), especially where the
definition as sexual misconduct is as broad as it was in the GBMPS at the time relevant to this
case. (Notably, the Complaint here does *not* allege that all sexual misconduct complaints at
Columbia in the relevant time were made by women against men; it merely alleges a "higher
incidence" of such complaints. (Am. Compl. ¶ 138).) Given that, a plaintiff alleging a violation
of Title IX based on the handling of a sexual misconduct complaint may well be able to identify
a similarly situated comparator.

[university] rules violations are treated differently than men are." *Haley*, 948 F. Supp. at 580-81. As in *Haley*, however, Plaintiff here "makes no such contentions." *Id.* at 581.

**PLAINTIFF'S STATE-LAW CLAIMS**

In light of the dismissal of Plaintiff's federal claim, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims. Pursuant to Title 28, United States Code, Section 1367, a district court has discretion over whether to exercise jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Supreme Court and the Second Circuit have made clear, however, that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Here, there is no basis to depart from that general rule. Given the relatively early state of the case, the traditional "values of judicial economy, convenience, fairness, and comity" that the Court must consider do not counsel in favor of exercising jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Accordingly, Plaintiff's remaining claims are dismissed.

**CONCLUSION**

This Court's "role, of course, is [not] to advocate for best practices or policies" with respect to the treatment of sexual assault complaints on college and university campuses. *Yu*, 2015 WL 1499408, at *10. Nor does Title IX "allow this Court to retry the University's disciplinary proceeding." *Doe v. Univ. of the South*, 687 F. Supp. 2d at 755 (internal quotation marks omitted). In fact, it is not even the Court's task to decide whether Columbia treated Plaintiff fairly or unfairly. Instead, the Court's task is limited to determining whether the

29

Complaint plausibly alleges that Columbia treated Plaintiff differently because of his sex.  In light of well-established Supreme Court and Second Circuit precedent, the Court is compelled to conclude that it does not — that, ignoring Plaintiff's conclusory assertions of gender bias, however heartfelt those assertions may be, there are simply no *factual* allegations that give rise to a plausible inference that Plaintiff was mistreated because of (rather than in spite of) his sex.

Accordingly, and for the reasons stated above, Columbia's motion to dismiss is GRANTED, and the Complaint is dismissed in its entirety.  The Clerk of Court is directed to terminate Docket No. 34 and to close the case.

SO ORDERED.

Date:   April 21, 2015
        New York, New York

_____
JESSE M. FURMAN
United States District Judge